770 A.2d 255

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ROBERT SMITH, DEFENDANT–APPELLANT.

Argued January 3, 2001—Decided May 8, 2001.

*Theresa Yvette Kyles,* Assistant Deputy Public Defender, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney; *Ms. Kyles* and *William P. Welaj,* Designated Counsel, on the briefs).

*Jordana Jakubovic,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

STEIN, J.

This is an appeal from a conviction for vehicular homicide. The specific issue is whether comments made by the prosecutor with respect to defendant's expert witnesses' compensation, and their relationship to the reliability of their testimony, constituted prosecutorial misconduct that requires a new trial.

## I

### A

On April 6, 1996, defendant, Robert Smith then age twenty-five, attended a sporting event in Philadelphia with his father and brother-in-law. Defendant admitted to drinking four or five twelve-ounce beers at the sporting event. At approximately 11:00 p.m., defendant and his father drove to defendant's uncle's house in Runnemeade, New Jersey, where he stayed for approximately half an hour. Thereafter, at around 11:30 p.m., defendant began driving home to Collings Lakes.

A few minutes before 1:00 a.m., Lynn Makowski, the vehicular homicide victim, left her boyfriend Wayne Green's hotel room riding a bicycle on Route 42. Wayne Green testified that he was living at the hotel at that time and that when Makowski left the hotel she told him that she was going to get cigarettes. However, two packs of cigarettes were found on Makowski's person after the accident. Moreover, when Makowski left the hotel, she was carrying a large bundle of clothes that, according to one of the investigating officers, "filled up three bags." Among those clothes were many personal possessions, including letters, cards, a comb and a pen. Defense counsel contended during summation that a more likely explanation for Makowski's departure from the hotel was that she and her boyfriend had had an argument and she was leaving him.

The evidence at trial revealed that Makowski was dressed in dark clothing except for white sneakers, and that there were no lights or retro-reflectors on her bicycle. Furthermore, subse-

quent tests disclosed that the alcohol content in Makowski's blood was 0.028 percent, a reading that indicated that prior to the accident she had consumed one or two alcoholic drinks. Blood tests also revealed that Makowski recently had inhaled cocaine. The Chief Toxicologist of the New Jersey State Toxicology Laboratory, Dr. Lang Lin, testified that the amount of cocaine found in Makowski's blood indicated very recent ingestion of cocaine, either by snorting or injection, that was enough to produce a deleterious effect on Makowski.

At approximately 1:00 a.m., defendant was driving toward his home on Route 42. It was a foggy, rainy night and the portion of Route 42 where the accident occurred was lit poorly. Route 42 was a two-lane highway and each lane was about ten-feet wide. The road's shoulder had numerous potholes and ruts and was not well-maintained. Defendant was driving within the speed limit when his vehicle struck and killed Lynn Makowski while she was riding her bicycle. Dr. Walter Hoffman, acting medical examiner of Gloucester County, testified that Makowski died as a result of blunt trauma and that the fracture and dislocation of her neck caused her immediate death. Makowski suffered multiple injuries, including abrasions and scrapes caused by her body being dragged, multiple fractures including the upper arms, and tearing of the lungs, heart and liver.

Defendant testified that at the time of impact he thought that someone had thrown a brick at his windshield. However, when he stopped his vehicle and saw an "uncontrollable moving body" on the side of the roadway he panicked and drove to a friend's house. That friend was not home, so defendant called his uncle and brother-in-law to tell them what had happened. Following their advice, defendant immediately drove to a nearby police station. At the police station, defendant was read his *Miranda* rights. At approximately 4:30 a.m. another officer arrived at the police station and he informed defendant of his *Miranda* rights for the second time. Defendant signed a waiver card and gave the police

an oral statement but declined to give a written statement about the events that led up to the automobile accident.

Although defendant appeared to understand his rights and articulated his words without difficulty, the police detected alcohol on his breath and asked him to provide a blood sample. Defendant agreed and the sample was tested. The alcohol content in defendant's blood was 0.103 percent. Based on that and other evidence elicited at trial, the jury could have found that defendant's blood alcohol content at the time of the accident was between 0.12 percent and 0.17 percent. The State estimated that defendant had consumed between six and nine twelve-ounce beers during the course of the evening prior to the accident.

In February 1997 a Gloucester County Grand Jury returned an indictment charging defendant with second-degree vehicular homicide, contrary to *N.J.S.A.* 2C:11–5 (count one), and second-degree reckless manslaughter, contrary to *N.J.S.A.* 2C:11–4b(1) (count two). Defendant also was charged with operating a motor vehicle while under the influence, *N.J.S.A.* 39:4–50, careless driving, *N.J.S.A.* 39:4–97, and leaving the scene of an accident, *N.J.S.A.* 39:4–129.

Defendant's jury trial in April and May of 1998 lasted six days. At trial, the State's theory of the case was that defendant was driving under the influence of alcohol when he struck and killed Makowski, who was riding her bicycle on the shoulder of the roadway. Defendant contended that the victim, while under the influence of cocaine, was riding her bicycle on the roadway without any reflector lights and that therefore the accident was unavoidable. Because criminal homicide constitutes "vehicular homicide when it is caused by driving a vehicle … recklessly," *N.J.S.A.* 2C:11–5, to find defendant guilty the jury had to find that defendant consciously disregarded a substantial and unjustifiable risk while driving his vehicle and that Makowski would not have died but for defendant's reckless conduct. Because the State and the defense presented expert witnesses who provided sharply conflicting testimony about where Makowski was riding her bicycle when

she was hit by defendant's car, defendant's guilt hinged on whether the jury believed the defense experts or the State's experts.

At trial, the State presented Corporal Eric Conova of the Washington Township Police Department as a witness. Although qualified to investigate accidents, he was neither an expert in accident reconstruction nor had any training on the subject. Conova testified that a Volkswagen (VW) emblem from defendant's 1991 GL Fox automobile was found close to the white line that runs between the roadway and the shoulder. He also testified that he saw glass from the vehicle's headlight on the edge line of the shoulder within a foot or two of the traveled portion of the roadway, and that the victim's sneaker was found on the edge line of the shoulder just south of the glass debris. Corporal Conova stated that Makowski's bicycle seat and front wheel were found, respectively, 339 feet and 345 feet south of what he alleged to be the point of impact. The bicycle frame was found on the edge line of the shoulder at the intersection of Route 42 and Laurel Avenue. Conova also stated that Makowski's body was found partially on the shoulder and partially on an intersecting street, Summit Avenue. She was about sixty-eight feet from what he believed to be the point of impact. With respect to the condition of the shoulder, Conova described photos shown to him as being representative of the condition of the roadway on the night in question. He stated that the shoulder was in very poor condition, with ruts and potholes that had standing water. Regarding defendant's car, Conova testified that the hood was damaged on the front right side, the front right headlight was broken, the windshield had collapsed inward and the VW emblem was missing. He also stated that the back wheel of Makowski's bicycle was found under defendant's car.

On cross-examination, Conova admitted that because the accident scene was not immediately secured after the accident occurred, there was a lapse of about half an hour during which other vehicles may have driven through the accident scene. Subsequently, defense counsel confronted Corporal Conova with an

authoritative text on accident reconstruction. Defense counsel read the following paragraph: "Because debris scatters so much, it is usually a poor indicator of where collision took place. Look for a better indicator of the collision point." Conova agreed that debris is an indicator of only the general area of an accident's point of impact, and admitted that he picked up only the largest pieces of headlight glass and did not collect the smaller pieces. He also acknowledged that because Route 42 has a "crown" drainage system, water on the roadway would drain toward the edge of the roadway. He stated that he did not know if the volume of rainwater was sufficient to have forced the smaller pieces of glass off the roadway to the shoulder. Conova also admitted that there were potholes and ruts that ran up and down the roadway's shoulder and that some of the potholes exceeded twelve inches in diameter.

Although Conova stated in his initial police report that "he could not place where victim's bike was riding prior to the accident," at trial he testified that he believed that the impact location was "from that edge line inward toward the right side of the shoulder, in that general area." He also stated that his statement was only a mere approximation and he admitted that the accuracy of his calculations could be "within several feet." We note that although Conova was questioned as if he were an expert in accident reconstruction, his opinion concerning the point of impact was elicited only as an opinion based on experience and not as an expert.

The State's only expert witness in the field of accident reconstruction was Lieutenant James Mentzer. Lieutenant Mentzer was then employed by the Monroe Township Police Department and was about to begin work with the Gloucester County Prosecutor's Office as a vehicle homicide investigator. His training and expertise included basic police science work and specialized training in traffic accident reconstruction and accident investigation. Mentzer's educational background included an Associate of Arts in Criminal Justice, a Bachelor of Arts in Law Justice and numerous

courses and seminars on accident reconstruction and bicycle crashes. He was qualified as an expert in many New Jersey courts and in federal court. He had taught courses at the police academy in Gloucester County. He was a member of numerous societies related to accident investigation and reconstruction and has published several articles on the subject. Although on *voir dire* the defense questioned whether Mentzer could give an opinion to a reasonable degree of scientific certainty when he was neither an engineer nor a physicist, the defense acknowledged that Mentzer was qualified as an expert witness.

In reaching his ultimate conclusion about where the impact occurred, Mentzer took into account the police reports, the autopsy report and photographs of the scene. He also visited the scene, saw the physical evidence and interviewed Corporal Conova. Mentzer testified that in his opinion the impact could not have occurred on the roadway. Instead, he believed that the point of impact occurred on the shoulder of the roadway. He explained that in reaching that conclusion he not only took into account the debris, but also the damage to the car and to the victim. He stated that Makowski's injuries to her neck and back were consistent with a collision where a bicycle was hit in the rear by a motor vehicle. He also stated that "the victim ... was obviously deposited onto the windshield and roof area of the vehicle" because "[t]he roof area of the vehicle was collapsed downward."

One of the major factors Mentzer relied on in arriving at his conclusion was the location of the debris. Mentzer specified that debris was "anything that came off the victim or came off the vehicle or the bicycle or the bicycle itself." Mentzer stated that the headlight glass debris was located close to the shoulder line of the roadway in a conical shape and that it was a good indicator of the general area where the impact occurred because the glass debris "is going to spread out just a little bit" from where the first contact occurred. Mentzer testified that in his opinion, after being hit by defendant's car "[t]he victim was carried some distance from the vicinity of where the impact occurred and fell off

of the shoulder surface, actually more onto a side street." Moreover, Mentzer stated that the position of the bicycle frame, front wheel, and seat, all of which were linearly positioned along the roadway's shoulder, was consistent with an impact that occurred on the shoulder rather than on the roadway. Mentzer also testified that the location of the debris was consistent with a "roof vault" type of accident and that "the victim was carried some distance from the vicinity of where the impact occurred and fell off of the surface, actually more onto a side street." Thus, Mentzer concluded that as a result of having consumed alcohol defendant operated his vehicle about three feet to the right of the shoulder line and the point of impact was "roughly two feet off the roadway."

On cross-examination, Mentzer conceded that the roadway's shoulder had deteriorated to the point that it had significant potholes. Moreover, he admitted that when he went out to investigate the scene the roadway already had been repaved, and that he made no independent effort to verify whether the size of the potholes, as described by Corporal Conova, was accurate. Mentzer also acknowledged that the debris is not a reliable indicator of the actual point of impact, and that he did not make any measurements to calculate the speed at which defendant was driving prior to the impact. He also admitted that he omitted conducting any inquiry about the extent of the lighting on the roadway at the time of the accident, and that he merely "induced the conspicuity aspect of the individual riding the bicycle." With regard to the location of Makowski's body, Mentzer acknowledged that studies have been done that indicate that victims of roof vaults often land in different places. He stated that Makowski's body moved "somewhat to the right over the roof," and that he could not "be certain as to how much or what angle she rolled to the right."

The defense called three expert witnesses. Dr. Richard Saferstein is a forensic scientist who has a Ph.D. in chemistry and has served for twenty-one years as the chief forensic scientist for the

New Jersey State Police. Saferstein has taught forensic science at the college level and has written a leading textbook in the field of forensic science. Saferstein testified that Makowski's blood contained a small quantity of alcohol and a significant quantity of cocaine (0.15 milligrams per liter). Saferstein explained that those findings reveal that Makowski used cocaine within two hours of her death. Saferstein concluded that decedent's performance level was likely affected by the cocaine. However, Saferstein acknowledged that his conclusion was based on an average person taking a street level dosage of cocaine and that individuals react differently to cocaine. In addition, Saferstein explained that a person using cocaine usually experiences euphoria and will take risks and "throw caution and self-restraint to the wind." Furthermore, he testified that in general individuals on cocaine sustain various physical impairments, including blurred vision.

The prosecution confronted Saferstein with only a few questions on cross-examination. The prosecutor elicited that there are no published studies that correlate a 0.15 milligrams per liter content of cocaine with a quantifiable measure of performance, and that Saferstein never made any efforts to quantify Makowski's actual impairment levels. However, on re-direct, Saferstein confirmed that there are published studies documenting cocaine's general side effects.

With regard to Saferstein's compensation, Saferstein was cross-examined by the prosecutor as follows:

Q. Dr. Saferstein, let me get this part out of the way. I don't intend to offend you, how much are you—how much were paid to work on this case?

A. I received $750 to review the file and to prepare a report. And I expect to be paid $1800 for my appearance here today.

The next defense expert was James Marley Green, an expert in forensic engineering and accident reconstruction of automobiles and bicycles. Green is one of only three forensic engineers in the United States who specialize in reconstructing bicycle accidents. He has a Bachelor of Science in physical science and a Masters degree in industrial hygiene (the study of modeling physical phenomena) and civil/operations research engineering. He is a

registered forensic engineer in seventeen states and has been qualified as an expert witness in all states except Idaho. Green testified that he has taught many seminars concerning pedacyclist accidents and that he has written four engineering books on automobile and bicycle accident reconstruction. He also has written a reconstruction handbook entitled "Bicycle Accident Reconstruction in Litigation," that has become a primary source handbook used by engineers and police departments.

Green has been active in the field of accident reconstruction for twenty-seven years, and has investigated "several thousand" pedacyclist accidents. Furthermore, Green explained that as part of his studies he performs tests at a test track laboratory where he can accelerate bicycles into vehicles using a large rotating plate of asphalt, and uses dummies to study how pedacyclists as well as the debris are affected at the point of impact. He stated that those studies enable him to locate more precisely an accident's point of impact. Green also testified that he is an experienced cyclist and that he raced professionally with racing teams for fifteen years. The State did not *voir dire* Green or question his credentials as an expert witness.

On direct examination, Green testified that he had reviewed all the physical evidence in the case, including police reports, toxicology reports, property receipts, photographs of the scene and weather reports. He also went to Route 42, once during the day and once at about 1:45 a.m., approximately the time that the accident took place. Green testified that he believed that Makowski could not have been riding her bicycle on the shoulder of the roadway and that she "more probably than not was definitely in the road at the time of the point of impact." He explained that because there were numerous large potholes in the shoulder it would be extremely difficult to ride on that surface. Green testified that although he is an experienced cyclist he would not have been able to ride his bicycle on that portion of the shoulder of Route 42.

Green opined that Makowski was hit from behind, and was rotated up on the hood of the car, onto the window and then

rotated off to the side of the car. Green made this determination based on a "crush profile" that reflects the likely response of a motor vehicle that strikes a cyclist. Furthermore, Green concluded that defendant's car was traveling at a low rate of speed, because decedent's body rotated off the side of the car. According to Green, if defendant were traveling at seventy to eighty miles-per-hour, Makowski's body would have been thrown over the car. Therefore, he concluded that the crush profile of defendant's accident is entirely consistent with a vehicle hitting a bicycle at a speed range of about thirty to fifty miles-per-hour.

In addition, Green testified that he has done considerable work on "conspicuity." Conspicuity relates to the ability to see objects under certain conditions. He testified that almost all safety regulations now in force regarding bicycles' conspicuity are based on his research and findings. Based on his extensive experience, Green stated:

> Based on the facts that it [was] dark, ... she was wearing dark blue clothing, ... [there was no] retro reflector [on the bike], ... there was not a light on the bike as required by New Jersey law, and the fact it was raining, I am going to say due to the reaction time available to the motor vehicle driver, she was, in essence, *invisible to him prior to the point of impact.*
>
> [ (Emphasis added.)]

Green explained to the jury how light-colored clothing, such as fluorescent green and yellow, are the best colors to illuminate someone at night, and that because Makowski was wearing dark clothing she was not visible. Green also stated that the rain likely affected defendant's ability to see the decedent. Because of the rain, "[a]s the motor vehicle approached the cyclist, the visibility of this cyclist had dropped from what could have been 1,200 to 2,000 feet down to 75 feet or less with the rain."

At the end of his direct testimony, Green stated that he was 100 percent confident that Makowski went over the side of the vehicle and did not vault over the vehicle, and further stated:

> I can talk in a degree of engineering certainty on this. Engineering certainty, by the way, is pretty serious for an engineer to say under oath. That means I'm 100 percent certain that something occurred. I like to talk in terms of engineering probability. That means more likely than not, but this is engineering certainty. I

would stake my reputation on this that the bike cyclist was hit from the rear, was rotated up onto the car, and was vaulted off the side ... [a]nd . . this cyclist was in the road when she was hit. She was not on the shoulder. I added to that, of course, the condition of the shoulder. I meant to get that into my answer.

Green's cross-examination by the prosecutor was short, and left Green's credibility virtually unchallenged. First, the prosecutor asked Green why it would be difficult to ride a bicycle on a surface with potholes. Green responded that one would have to maneuver around the potholes, and that this would have been difficult to do because there was no illumination of the roadway. The prosecutor then told Green that there was a street light post at the scene, and asked whether that would illuminate the area enough to allow a bicyclist to maneuver around potholes and be seen by drivers. Green responded that a "light post" only gives off about twenty feet of light, and that there would not be enough light to silhouette the area.

The prosecutor then questioned whether the decedent's bicycle contained a retro-reflector, and inquired if it was possible for a retro-reflector to be knocked off the bike if a rider was hit from behind. Green acknowledged that possibility, but stated that no retro-reflector was found at the scene. The prosecutor reminded Green that the decedent was wearing white sneakers, and asked whether that would make her more visible. Green stated that the white sneakers would not make her more visible because "90 percent of visualization ... is from the center of gravity or belly bottom to the top of your head." The prosecutor also noted that a bundle of clothing was found on the scene and that some of the items were light blue and white. Green acknowledged that if decedent were carrying those items "at belt level" they might have been visible. Finally, in terms of where the decedent was struck, Green agreed that irrespective of whether the car was in the right lane of the roadway, or partially in the right shoulder of the roadway, a cyclist struck by the car would be thrown to the right-hand side of the roadway.

With regard to Green's compensation, the prosecutor asked the following:

Q: Mr. Green, let me just start out, how much were you paid for your services here today and in preparation for this case?

A: I don't have the billings, but I can just give you what my normal rate is. I normally charge—my company charges $225 an hour for my time at trial if I have to travel, and then $200 an hour for my time at work.

Defense's last expert was Scott Batterman, who is an experienced forensic scientist. Batterman has a Bachelor of Science in civil and urban engineering, a Masters of Science in civil engineering and a Ph.D. in mechanical engineering and applied mechanics. He has taught as an adjunct professor at Villanova University and has given presentations and authored publications and papers on accident reconstruction. Batterman has experience in reconstructing "hundreds" of accidents since 1989 and has been qualified as an expert in several New Jersey courts and in Pennsylvania courts.

On direct examination, Batterman explained that in preparing his report for this case he looked at several items, including the photographs of the scene, and he inspected the remains of Makowski's bicycle as well as the scene of the accident. Batterman testified that the debris found on the scene was not a reliable indication of the exact point of impact because debris "spreads over a fairly wide area." He also stated that, according to reliable scientific literature, one cannot rely exclusively on the location of accident debris to determine the exact point of impact. With regard to the headlight glass debris, Batterman explained that although some pieces of glass were found on the shoulder of the roadway, that evidence was inconclusive because headlight debris spreads and scatters before it hits the ground. Batterman noted that not all the headlight glass was recovered and that the bumper of the car could have prevented the glass from falling. Batterman also commented on the VW emblem, stating that "there is no way to scientifically conclude that because a piece of light plastic which flew off a car which had been on an accident came to rest at that spot . . . that the car was straddling the fog line at the time of impact." Batterman also refuted Mentzer's testimony that Makowski's sneaker, found on the edge line of the shoulder of the

roadway, was relevant in determining the exact point of impact. Batterman observed that "you cannot use [the sneaker's] resting point" to determine where the impact occurred. Batterman concluded:

> Basically, when you consider the totality of the evidence, the fact that debris is a poor indicator of the location at the point of impact means that you really can't tell exactly where the impact occurred; however, in this case, we know that adjacent to the fog line on the shoulder, there are a lot of potholes and it was pretty rough terrain. So in my opinion, it is more likely than not that she would have been to the left of the fog line or in the travel lane portion of the roadway. And that's essentially my opinion to a reasonable degree of certainty that she likely was in the travel portion. And the presence of debris touching the fog line and to the right cannot be used to validate the fact or to reach a conclusion that impact had to have been on the shoulder of the roadway. You just can't do that.

On cross examination, Batterman acknowledged that even if Makowski was in fact riding on the roadway prior to impact, she could not have been "too far into the lane."

The prosecutor also questioned Batterman with respect to his compensation. The prosecutor asked the following:

Q: Dr. Batterman, I'm going to bring up something that [defense counsel] already brought up; but, basically, how much are you getting paid to participate in this case?

A: My hourly rate is $240 an hour.

Q: Does that include—the $240 an hour for the time that you spent going to the police station?

A: Yeah. My time is my time. I mean, if I'm asked to spend hours on the case, and that's my hourly rate.

Q: Okay. And do you have, for example, if you have to testify in court, do you have set number of hours or a minimum number of hours that you charge, or do you just charge by the hour?

A: No. It's portal to portal for how ever long it takes me. The same hourly rate.

Q: Okay.

A: It doesn't matter what I'm doing if my—if you're tying me up for an hour, then you pay for an hour of my time.

Q: But you're not like some of these experts if they show up for an hour, they want eight hours. It's not that situation?

A: No.

Q. From the time you leave your office until the time you get back.

A. Right.

## B

The critical legal issue in this appeal involves the prosecutor's comments during summation. Specifically, the prosecutor commented on the conflict between the State's expert's testimony and the defendant's experts' testimony. He told the jury that it did not have to accept the testimony "just because somebody with a degree or with whatever qualifications says that that's the way it is. You don't have to." The prosecutor then proceeded to state the following:

> In this case, you have Lieutenant Mentzer, who admitted he is associated with the police, on the one hand. You have two individuals on the other hand, who are hired, paid consultants. Now, admittedly, they have to make a living. They charge hefty fees, and you can decide whether those hefty fees would influence their testimony at all; whether it would influence them to shade their testimony at all, whether they would hope to get hired by persons in the future in similar situations; and, therefore, would want to have certain testimony, so they can collect those fees in the future. You'll have to consider that in your judgment.

Defense counsel immediately objected. At sidebar, defense counsel stated that the remarks go to "the defense attorney being in cahoots ... with the expert witnesses." In response, the prosecutor stated that his understanding was that he was "allowed to comment on any bias that might be generated by the fees." In addition, he stated that his comment was permissible because he "did not specifically say the defense attorney" may hire the experts in the future. In response, the trial court stated "[n]o, but that's the correlation that you made. That is the correlation that you just made about hopes of being hired in similar cases in the future."

Accordingly, the court immediately instructed as follows:

> Ladies and gentlemen, please disregard the comment made by [the prosecutor] about any hopes of any experts being hired in [the] future by other attorneys, presumably defense attorneys in other criminal cases in the future. That was not a proper comment, and disregard it.

The prosecutor then continued with summation:

> Ladies and gentlemen, I made an improper comment. I apologize to you. I was not aware of the impropriety of the argument, but the Judge has ruled.

In any event, you can consider the fees, and there will be no argument about that. You can consider the fees when you're considering whether the expert is telling the truth or not or whether the expert has shaded his testimony.

Before deliberations, the court instructed the jury with respect to the prosecutor's comment during his formal charge, stating the following:

You're also instructed that the amount of an expert witness's fee is a matter which you may consider as possibly affecting the credibility, interest, bias, or partisanship of the witness. However, since all expert witnesses expect to be paid and are paid, you are instructed that there is nothing improper in an expert witness being paid a reasonable fee for his work and time in attending court and in preparing for attendance in . . . court.

Defendant did not object to that instruction.

The jury convicted defendant of the vehicular homicide charge. At sentencing, defendant renewed his original complaint with respect to the prosecutor's closing comments on expert fees, this time in the context of a motion for a new trial. He argued that the prosecutor had exceeded the scope of the record and that his comments amounted to an "implication that the experts testimony on behalf of the defense was fabricated or contrived with the assistance of defense counsel."

In response, the prosecutor stated that the comments were not intended

to indicate that these experts sat down with [defense counsel] and cooked up testimony in order to make themselves more marketable to [defense counsel] in the future. The comments were made in a way so as to allow the jury to consider the possibility that the experts in order to make themselves more marketable to the defense bar in general in the future, may have shaded their testimony. And that argument was made in conjunction also with an argument to the effect that the jury could consider the expert's fees.

The trial court reiterated its belief that the comment was inappropriate, but "that in the overall context of the prosecutor's summation and comments that was a relatively insignificant comment that was adequately addressed by the curative instruction that I gave."

The court also stated:

[I]n the general instruction that I gave in my final instructions to the jury about experts, I gave the standard instruction regarding fees, that they could consider

that, but they should also consider that there's nothing improper with experts being paid for their time, and they're expected to be paid for their time.

The trial court denied defendant's motion for a new trial, and added the following:

There was conflicting evidence on both sides. The jury could have gone either way on this.... There was clearly evidence to support that finding of guilt that is. And they chose to rely upon that evidence rather than contradictory evidence.

Subsequent to the jury's verdict, the trial court found defendant guilty of leaving the scene of an accident, contrary to *N.J.S.A.* 39:4–129, and operating a vehicle while under the influence of alcohol, *N.J.S.A.* 39:4–50. Defendant was sentenced on the vehicular homicide conviction to a five-year term of imprisonment with a three-year period of parole ineligibility. Appropriate fines and penalties were imposed, and defendant's driving privileges were revoked for two years pursuant to *N.J.S.A.* 2C:43–2(c). The driving under the influence violation was merged for sentencing purposes with the vehicular homicide conviction. For leaving the scene of the accident, in violation of *N.J.S.A.* 39:4–129, defendant was sentenced to a $500 fine and an additional one-year revocation of driving privileges.

The Appellate Division affirmed defendant's conviction and sentence. The panel found no merit to the defense arguments that (1) the prosecutor improperly commented on defendant's right to silence, (2) that the prosecutor's summation exceeded the bounds of propriety by his comments regarding defendant's expert witnesses' fees, (3) that the verdict was against the weight of the evidence, and (4) that his sentence was excessive. With regard to the summation, the Appellate Division panel stated:

We are satisfied the prosecutor's remarks were not so improper as to warrant a new trial. A jury is entitled to hear that an expert witness is paid for the report and testimony provided. That information is properly factored into the evaluation of the witness's credibility. Here, the prosecutor did little more than point that out to the jury, although he did so with greater elaboration than was appropriate. The expert witnesses' prospects of future employment as possibly shading their testimony was best left unsaid, although such an inference was not necessarily unavailable to the jury as a logical component of the general nature of expert testimony. Nevertheless, the prosecutor did not cast aspersions on the witnesses or on defendant and defense counsel so as to improperly demean them.... Here,

the remarks were marginally improper and, in the context of the entire trial, not capable of producing an unjust result.

We granted certification. *State v. Smith,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000).

## II

 We have consistently recognized that prosecutors are afforded considerable leeway in their closing arguments. *State v. Frost,* 158 *N.J.* 76, 82, 727 *A.*2d 1 (1999); *State v. Harris,* 141 *N.J.* 525, 559, 662, 662 *A.*2d 333 (1995). Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries. *Frost, supra,* 158 *N.J.* at 82, 727 *A.*2d 1; *Harris, supra,* 141 *N.J.* at 559, 662 *A.*2d 333. However, "the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done." *Frost, supra,* 158 *N.J.* at 83, 727 A.2d 1 (citing *State v. Ramseur,* 106 *N.J.* 123, 320, 524 *A.*2d 188 (1987)). Thus, a prosecutor's duty is twofold: a prosecutor must refrain from improper methods that result in a wrongful conviction, and is obligated to use legitimate means to bring about a just conviction. *Ibid.; State v. Farrell,* 61 *N.J.* 99, 105, 293 *A.*2d 176 (1972) (citing *Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)). However, the increased frequency of prosecutorial misconduct recently caused us to observe that

"because the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent." His comments during opening and closing carry the full authority of the State. Hence, we cannot sit idly by and condone prosecutorial excesses.

[*Frost, supra,* 158 *N.J.* at 87, 727 *A.*2d 1 (quoting *State v. Spano,* 64 *N.J.* 566, 568, 319 *A.*2d 217 (1974)).]

Our Court has articulated several principles with respect to the appropriateness of prosecutor's comments. We recently held that prosecutors are not permitted to cast unjustified aspersions on the defense or defense counsel. *Id.* at 86, 727 *A.*2d 1. We specifically noted that a prosecutor is not permitted to characterize defense counsel's argument as "lawyer talk." *Ibid.; see also State v. Pindale,* 249 *N.J.Super.* 266, 286, 592 *A.*2d 300 (App.Div.1991)

(holding that prosecutors are not permitted to tell jury that "defense's role in this case is to try to confuse you"); *State v. Setzer,* 268 *N.J.Super.* 553, 565, 634 *A.*2d 127 (App.Div.1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994) (holding it improper for prosecutor, without support in evidence, to accuse defendant of conspiring with his counsel to conceal and distort the truth); *State v. Acker,* 265 *N.J.Super.* 351, 356, 627 *A.*2d 170 (App.Div.), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993) (holding that prosecutors are not permitted to characterize defense attorney and defense as "outrageous, remarkable, absolutely preposterous and absolutely outrageous").

We also have held that prosecutors should not make inaccurate legal or factual assertions during a trial and that they must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence. *Frost, supra,* 158 *N.J.* at 86, 727 *A.*2d 1; *State v. Marks,* 201 *N.J.Super.* 514, 534, 493 *A.*2d 596 (App.Div.1985), *certif. denied,* 102 *N.J.* 393, 508 *A.*2d 253 (1986). We have acknowledged that if a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, "by way of comment, denunciation or appeal, will afford no ground for reversal." *State v. Johnson,* 31 *N.J.* 489, 510, 158 *A.*2d 11 (1960). However, we have "not hesitated to reverse convictions where we have found that the prosecutor in his summation over-stepped the bounds of propriety and created a real danger of prejudice to the accused." *Id.* at 511, 158 *A.*2d 11.

Although our case law is limited, several cases have addressed circumstances in which the prosecutor directly demeans the credibility of a defense witness. In *State v. Rose,* 112 *N.J.* 454, 548 *A.*2d 1058 (1988), defendant was convicted for the murder of a police officer and appealed his death sentence. *Id.* at 474, 548 *A.*2d 1058. We reversed defendant's death sentence for a number of reasons, including that the cumulative effect of prosecutorial improprieties were substantially prejudicial and deprived defendant of his constitutional right to a fair trial. *Id.* at 523, 548 *A.*2d

1058. During summation, defense counsel argued that the State failed to rebut defense expert testimony presented during the penalty phase. *Id.* at 518, 548 *A.*2d 1058. During the State's summation, the prosecutor responded:

[Defendant] knew at the time he was interviewed by these doctors what his defense was.... The doctors knew that. They were explained the law by the lawyers, as to what he's being charged with, what he faced and how he could beat the penalty that the law provides for him and they came in here and they as counsel said uncontradicted gave an opinion. Well, the Judge will charge you their opinion is only as good as the facts upon which they base their opinion and some of the facts were wrong and some of the facts were nonexistent.

[*Ibid.*]

We held that the prosecutor's comments were "clearly improper" because he implied that the expert's testimony was fabricated or contrived with the assistance of defense counsel. *Id.* at 518–19, 548 *A.*2d 1058. We stated:

There was no support in the record for the prosecutor's innuendo. The experts were both well qualified, and they carefully explained the basis for their opinions.... Without an adequate foundation in the record, the prosecutor's implication that the expert testimony was contrived was totally unwarranted.

[*Ibid.*]

We based our holding, in part, on Justice Clifford's dissenting opinion in *State v. DiPaglia,* 64 *N.J.* 288, 298–307, 315 *A.*2d 385 (1974). In *DiPaglia,* the defendant was convicted of armed robbery, theft of a motor vehicle, assault with intent to kill a police officer, and carrying a weapon without a permit. *Id.* at 290, 315 *A.*2d 385. The defense argued that the defendant was insane and should not be held culpable for these crimes. *Ibid.* In response, the prosecutor stated in summation that defendant was "crazy like a fox." He went on to argue that the insanity defense "was a carefully contrived fabrication" to avoid defendant's responsibility. *Id.* at 296, 315 *A.*2d 385. Despite those comments, the majority of the Court held that the defendant was not prejudiced by the remarks. The majority explained that the entire trial was "hard-fought," but there was no indication that the jury was misled by the prosecutor's comments. *Id.* at 297, 315 *A.*2d 385.

Justice Clifford observed that the prosecutor's comments implied that the defense was "fabricated," *id.* at 299, 315 *A.*2d 385,

noting that not only were the prosecutor's statements improper, but that they were "contrary to the evidence." The dissent explained that the defense experts and lay witnesses all testified that the defendant was insane, *ibid.*, noting that the defense argument was "a respectable one" and that defendant's sanity was a sharply contested issue at trial. *Ibid.* The dissent concluded that "[t]he implication that the defense was fabricated was simply unsupported by any view of the record." *Id.* at 300, 315 *A.2d* 385.

More recently, in *State v. Moore*, 122 *N.J.* 420, 585 *A.2d* 864 (1991), the defendant was convicted of murdering his wife and child. *Id.* at 428, 585 *A.2d* 864. We reversed the conviction on other grounds and did not determine whether any alleged misconduct constituted reversible error. However, we cautioned prosecutors about discrediting the motivation of expert witnesses "without support in the record" and "apparently based only on the prosecutor's own opinion." *Id.* at 462, 585 *A.2d* 864. We also noted that comments to the effect that a defense expert was a "professional bleeding heart who was indeed duped by the defendant" were improper. *Id.* at 461–62, 585 *A.2d* 864.

In *State v. Marquez*, 277 *N.J.Super.* 162, 170, 649 *A.2d* 114 (App.Div.1994), *certif. denied*, 141 *N.J.* 99, 660 *A.2d* 1198 (1995), the defendant was convicted of false imprisonment as a lesser included offense of kidnaping and assault. During his closing remarks, the prosecutor stated:

The two psychiatrists—two psychologists, I am sorry, two psychologists that came in here yesterday were a joke. Absolute joke.

They were laughing. When you consider what they had to say to you, a lot of mumbo-jumbo, they hid behind words. They couched everything in terms of words....

These guys get on the scene 17 months later now, they come to the scene and all of a sudden he cannot—can't understand English.

I don't know if that's so or Dr. Rotgers figured he would get somebody else on the tab here that can bill $100 an hour for their time and services and come into court here.

My friend Frank Dyer, bring him in. He can earn a couple of bucks....

You know what the most telling portion of this put-up job, the travesty to put on you ... do you remember that long rambling hypothetical situation Miss Kean gave both the psychologists?

It took a long time. Assume a lot of facts, assume this; assume that; assume another thing. The first—what significance is that to you? The first words literally out of both of their mouths were identical. Do you remember what they said? Yes, I put some significance on that. Yes, he had some problems. Putting the blood on that ID card indicated to me extreme psychosis. It is like they were reading it from a script.

And it did come like later on in their testimony. It was fairly, virtually the first things out of their mouths.

Most respectfully, the first thing.

You know, if that isn't a put-up job, if that is not rehearsed, if that isn't a travesty being forced upon you, members of this jury, I don't know what is.

[*Id.* at 170–71, 649 *A.*2d 114 (emphasis omitted).]

The Appellate Division concluded that the prosecutor's comments were unsupported by the record, and that the prosecutor's implication that the experts' testimony had been scripted for them by defense counsel mischaracterized the record. *Id.* at 172, 649 *A.*2d 114. Moreover, the Appellate Division noted that the prosecutor "was not, however, entitled to tell the jury that defendant's attorney had prepared a script for the witnesses' testimony and that defense counsel presented a 'put-up' defense." *Ibid.* Although the Appellate Division was deeply troubled by the prosecutor's improper remarks, it declined to reverse defendant's convictions on that ground, concluding that defendant's right to a fair trial was not substantially prejudiced because the jury acquitted him of kidnaping, as well as of aggravated assault. *Id.* at 173, 649 *A.*2d 114.

In addition to determining whether a prosecutor committed misconduct, a court also must decide whether the prosecutor's misconduct constitutes grounds for a new trial. A finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been "so egregious that it deprived the defendant of a fair trial." *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1; *State v. Pennington,* 119 *N.J.* 547, 566, 575 *A.*2d 816 (1990); *State v. Hawk,* 327 *N.J.Super.* 276, 281, 743 *A.*2d 325 (App.Div.2000); *State v. Ribalta,* 277 *N.J.Super.* 277, 293–94, 649 *A.*2d 862 (App.Div.1994), *certif. denied,* 139 *N.J.* 442, 655 *A.*2d 444 (1995). Thus, to warrant a new trial the prosecutor's conduct must have been " 'clearly and

unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Timmendequas,* 161 *N.J.* 515, 575, 737 *A.*2d 55 (1999). In determining whether a prosecutor's actions were sufficiently egregious to warrant the reversal of a conviction, a reviewing court should take into account: (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them. *Ibid.; Marshall, supra,* 123 *N.J.* at 153, 586 *A.*2d 85; *Ramseur, supra,* 106 *N.J.* at 322–23, 524 *A.*2d 188.

### III

Defendant argues that the following comments made by the prosecutor during summation constituted misconduct and deprived him of a fair trial. Referring to the expert witnesses' credibility the prosecutor stated:

> In this case, you have Lieutenant Mentzer, who admitted he is associated with the police, on the one hand. You have two individuals … who are hired, paid consultants. Now, admittedly, they have to make a living. They charge hefty fees, and you can decide whether those hefty fees would influence their testimony at all; whether it would influence them to shade their testimony at all, whether they would hope to get hired by persons in the future in similar situations; and, therefore, would want to have certain testimony, so they can collect those fees in the future. You'll have to consider that in your judgment.

Defendant contends that those comments clearly insinuated that because the expert witnesses were being compensated for their work, they therefore "hoped" to be hired in the future presumably by defense counsel and accordingly "shaded their testimony" to the advantage of the defense.

To determine whether the prosecutor's comments were inappropriate we begin by inquiring whether the prosecutor's legal or factual assertions were accurate, *Frost, supra,* 158 *N.J.* at 85, 727 *A.*2d 1, and whether the comments were confined to the evidence revealed during the trial and reasonable inferences to be drawn from that evidence. *Id.* at 86, 727 *A.*2d 1. First, we note

that there was no aspect of defense expert witnesses' testimony or cross-examination that remotely suggested that the defense expert witnesses fabricated their testimony or that they were motivated to lie. To the contrary, the prosecutor's cross-examination of defense experts had absolutely no adverse effect on their credibility. For example, during Saferstein's cross-examination, the prosecutor elicited only that there are no published studies that may correlate a 0.15 milligrams per liter content of cocaine with a quantifiable measure of performance, and that Saferstein never made any efforts to quantify Makowski's actual impairment levels.

Likewise, during Green's cross-examination Green simply responded to the prosecutor's relatively subdued questioning. Green responded, for example, that it would have been difficult to ride a bicycle on a surface with potholes because one would have to maneuver around them and there was no illumination of the roadway. He clarified that the street light on Route 42 would not have provided enough light to silhouette the area. In addition, Green acknowledged the possibility that decedent's bicycle might have contained a retro-reflector, but stated that no retro-reflector was found at the scene. Green also clarified that Makowski's white sneakers would not have made her more visible because "90 percent of visualization ... is from the center of gravity or belly bottom to the top of your head." Finally, Green acknowledged that if Makowski were carrying the bundle of clothes and personal belongings "at belt level" they might have been visible. Similarly, during expert witness Batterman's cross-examination he merely acknowledged that Makowski was riding not too far into the roadway's lane, but the prosecutor's interrogation did not challenge his credibility. Therefore, the State's cross-examination of the defense experts had an insignificant impact on their credibility, and the substance of their testimony was unchallenged.

In addition, there was absolutely no evidence in the record suggesting that defendant's experts had relied or were relying on defense counsel for employment either in the past or in the future. In short, the record is barren of any implication that the experts

fabricated their answers or were motivated to draw favorable conclusions based on their relationship with defense counsel or their expectation of future employment. The impropriety of the prosecutor's comments is analogous to those in *Rose, supra,* 112 *N.J.* at 518, 548 *A.*2d 1058, where the prosecutor's comments implied that the expert's testimony was fabricated or contrived with the assistance of defense counsel.

Moreover, the prosecutor's comments improperly implied that because Lieutenant Mentzer was not paid, and the defense experts were, the State's witness was more credible. In practical terms, the prosecutor's remarks could have been understood by the jury as an implied endorsement of the credibility of the State witness. See *Frost, supra,* 158 *N.J.* at 85, 727 *A.*2d 1 (stating that statements by prosecutor about police officer's credibility are wholly inappropriate).

We also note that all three defense experts were exceptionally qualified and highly reputable. For example, Green, one of only three forensic engineers in the United States who specialize in reconstructing bicycle accidents, has written four engineering texts on automobile and bicycle accident reconstruction, as well as a reconstruction handbook that has become a primary source handbook used by engineers and police departments. His research and findings on "conspicuity" of bicycle riders has led to wide adoption of safety regulations now in force regarding bicycles' conspicuity. Dr. Saferstein had served for twenty-one years as the chief forensic scientist for the New Jersey State Police. Dr. Batterman had extensive teaching experience in the field of accident reconstruction and had experience in reconstructing "hundreds" of accidents since 1989.

In view of the exceptional qualifications of the defense expert witnesses, and because the defense expert witnesses' cross-examination left their credibility unchallenged, there was no support in the record for the prosecutor's innuendo that the defense expert witnesses' "hefty fees" would "influence them to shade their testimony" because they "hope[d] to get hired by persons in the

future in similar situations." We conclude that the prosecutor's remarks were improper and constituted prosecutorial misconduct.

█ To determine whether the prosecutor's misconduct justifies a new trial we must consider whether the misconduct was "so egregious that it deprived the defendant of a fair trial." *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1. On that point, we note, as did Justice Clifford in *DiPaglia, supra,* 64 *N.J.* at 300, 315 *A.*2d 385, that the issues testified about by the expert witnesses were highly contested at trial. To find defendant guilty of vehicular homicide, the jury had to find that defendant consciously disregarded a substantial and unjustifiable risk while driving his vehicle, and that Makowski would not have died but for defendant's reckless conduct. See *N.J.S.A.* 2C:11–5. That Makowski died as a result of blunt trauma caused when defendant's vehicle struck her while she was riding her bicycle is undisputed. However, defendant's theory of the case at trial was that defendant was not driving his vehicle recklessly, and that because Makowski was not visible and was riding her bicycle on the travel portion of the roadway the accident was unavoidable.

Because the expert witnesses' testimony, although somewhat divergent, agreed that defendant was driving well within the speed limit, see *supra* at 169–70, 770 *A.*2d at 261–62, the only issue regarding defendant's driving was the manner in which he was driving his car. Defense counsel contended in his summation that defendant "was operating the vehicle fine ... [t]here is no indication that he was ... swerving all over the roadway." On the other hand, the State argued that, while under the influence of alcohol, defendant recklessly drove his vehicle on the shoulder of the roadway and hit Makowski. Therefore, the issue of whether the accident occurred on the shoulder or on the roadway was critical at trial.

We again summarize the sharply conflicting expert witnesses' testimony concerning the point of impact of the collision between defendant's car and Makowski's bicycle. Lieutenant Mentzer, the State's accident reconstruction expert witness, testified that the

point of impact occurred on the shoulder of the roadway. Mentzer concluded that as a result of having consumed alcohol defendant operated his vehicle about three feet to the right of the shoulder line and the point of impact was "roughly two feet off the roadway." Mentzer based that conclusion on the location of the headlamp glass debris, the VW emblem, and Makowski's sneaker, found on the edge line of the shoulder of the roadway, as well as on the linearly positioned debris consisting of the bicycle frame, front wheel, and seat, found along the shoulder of the roadway. However, on cross-examination, Mentzer acknowledged that debris is not a good indicator of the actual point of impact.

On the other hand, defense expert Green testified that based on a "crush profile," in his opinion Makowski was hit from behind, and was rotated up on the hood of the car, onto the window and then rotated off to the side of the car. Moreover, based in part on the condition of the roadway's shoulder, Green stated with certainty that Makowski was on the road when she was hit and not on the shoulder of the roadway. Scott Batterman, the other defense expert, testified that the debris found at the scene was not a reliable indication of the exact point of impact because debris "spreads over a fairly wide area." Batterman also challenged the significance of the debris used by Mentzer to calculate the exact point of impact. Batterman stated that the location of the headlight glass debris was inconclusive because it usually spreads and scatters before it hits the ground, and that the bumper of the car could have prevented the glass from falling. Batterman also stated that defendant's car's VW emblem and Makowski's sneaker, found on the edge line of the shoulder of the roadway, were not relevant in determining the exact point of impact:

Basically, when you consider the totality of the evidence, the fact that debris is a poor indicator of the location at the point of impact means that you really can't tell exactly where the impact occurred; however, in this case, we know that adjacent to the fog line on the shoulder, there are a lot of potholes and it was pretty rough terrain. So in my opinion, it is more likely than not that she would have been to the left of the fog line or in the travel lane portion of the roadway.

Defense counsel also argued during summation that because Makowski was riding her bicycle without any retro-reflectors and

wearing dark clothes, her lack of conspicuity was an "efficient cause" of the accident. When defendant described how the accident occurred, he stated that he never saw Makowski and that at the time of impact he thought that someone had thrown a brick at his windshield. The evidence adduced at trial revealed that the night of the accident was foggy and rainy, and the road was poorly lit. Moreover, Makowski was dressed in dark clothing except for white sneakers, and there were no lights or retro-reflectors on her bicycle.

Concerning Makowski's conspicuity, defense expert, Green, stated:

> Based on the facts that it [was] dark, ... [Makowski] was wearing dark blue clothing, ... [there was no] retro reflector [on the bike], ... there was not a light on the bike as required by New Jersey law, and the fact it was raining, I am going to say due to the reaction time available to the motor vehicle driver, she was, in essence, invisible to him prior to the point of impact.

Green also stated that the rain likely affected defendant's ability to see the decedent.

Lastly, defense counsel argued that the fact that Makowski was riding her bicycle under the influence of alcohol and cocaine also contributed to her death. Concerning the possible effect that the cocaine may have had on Makowski, defense expert witness Saferstein testified that in his opinion, because Makowski used cocaine within two hours prior to her death, her performance level while riding her bicycle was likely affected by the cocaine. In addition, Saferstein also stated that a person using cocaine often experiences euphoria and will take risks "throw[ing] caution and self-restraint to the wind," and that in general individuals on cocaine sustain various physical impairments, including blurred vision.

Because the expert witnesses' testimony about where Makowski was riding her bicycle when she was hit by defendant's car was highly contested at trial and because defendant's guilt depended entirely on which experts the jury believed, we conclude that the inappropriate comments made by the prosecutor could have improperly swayed the jury and denied defendant a fair trial.

On this record, we are persuaded that the prosecutor's egregious comments that the defense experts may have "shaded their testimony" in the hope of future employment requires a new trial. We note that the prosecutor's comments resulted in an immediate objection by defense counsel, followed by an attempted curative instruction. See *Timmendequas, supra*, 161 *N.J.* at 575, 737 *A.*2d 55; *Marshall, supra*, 123 *N.J.* at 153, 586 *A.*2d 85; *Ramseur, supra*, 106 *N.J.* at 322–23, 524 *A.*2d 188. The court told the jury to "disregard the comment made by [the prosecutor] about any hopes of any experts being hired in [the] future by other attorneys, presumably defense attorneys in other criminal cases in the future." Moreover, the court provided the jurors with an expert witness instruction and separately charged them on the use of expert fee evidence. See *supra* at 175, 770 *A.*2d at 265. We also note, however, that immediately following the court's curative instruction the prosecutor reiterated that "[y]ou can consider the fees, and there will be no argument about that. You can consider the fees when you're considering whether the expert is telling the truth or not or whether the expert has shaded his testimony."

Although the State contends that in the context of the curative instruction the comments were harmless, here the guilt or innocence of defendant hinged on whether the jury believed the defense experts or the State's experts. Specifically, if the jury believed defense experts' testimony that Makowski was riding her bicycle on the traveled portion of the roadway and that she was invisible to defendant prior to the impact, it is virtually certain that the jury would have acquitted defendant of vehicular homicide, *N.J.S.A.* 2C:11–5, because defendant's conduct could not have been the proximate cause of Makowski's death. Because defendant's guilt or innocence depended on whether the jury believed the defense witnesses, the prosecutor's comments clearly were capable of having an unfair impact on the jury's deliberations, thereby depriving defendant of a fair trial. *Frost, supra*, 158 *N.J.* at 83, 727 *A.*2d 1; *Pennington, supra*, 119 *N.J.* at 566, 575 *A.*2d

816; *Hawk, supra,* 327 *N.J.Super.* at 281, 743 *A.2d* 325; *Ribalta, supra,* 277 *N.J.Super.* at 293–94, 649 *A.2d* 862. In our view, the prosecutorial misconduct was not harmless and a new trial is warranted. *Timmendequas, supra,* 161 *N.J.* at 575, 737 *A.2d* 55.

Finally, we note that in criminal cases the State's expert witnesses are almost always unpaid. Accordingly, we question the fairness of a jury instruction in criminal cases that merely states that the amount of a defense expert witness' fee is a matter that a jury may consider as possibly affecting the credibility of the witness. Such an instruction, in a close case, may tip the scales in favor of the credibility of the State's expert witnesses who, although unpaid, may have an equal or greater interest in the outcome than do the defense witnesses because they often are employed by a law enforcement agency involved in the prosecution. We request the Supreme Court Committee on Model Jury Charges, Criminal to consider the issue and to modify the standard expert witness instruction to achieve better balance in the trial of criminal cases.

## IV

We reverse the judgment of the Appellate Division affirming defendant's conviction and remand the matter to the Law Division for a new trial.

LONG, J., concurring

I concur in the majority's disposition of this case. Plainly, the prosecutor's unwarranted comment that defense experts may have "shaded their testimony" in the hope of future employment had the capacity to poison the jury's verdict, which essentially depended on its assessment of conflicting expert testimony.

I am also in full accord with the majority's reference of the larger issue of paid experts in criminal cases to the Model Charge Committee to address the fairness of the present instruction on expert fees in criminal cases in light of the fact that it "may tip the scales in favor of the credibility of the State's witnesses who,

although unpaid, may have an equal or greater interest in the outcome than do defense witnesses because they are often employed by a law enforcement agency involved in the prosecution." *Ante* at 189, 770 *A*.2d at 274.

In my view, the entire notion of allowing jurors to consider the amount paid to an expert as bearing on credibility needs rethinking. Indeed, it is the *fact* of payment, not the amount, that is the counterweight to a jury's natural conclusion that a witness employed by the State or one of its subdivisions is an interested party. Once the *fact* of payment to the defense expert is revealed, the playing field is leveled.

At that point, a unitary instruction tailored specifically to the vast majority of criminal cases in which the State's expert is "unpaid" and defense expert "paid" should be given. The instruction should include, among other things, an explanation of the practical reasons why the State is not required to resort to paid experts; that the defense generally does not have access to a stable of "unpaid" witnesses; and that payment of experts by the defense is simply part of the business of trying a case.

Further, the Committee should revisit the following language in the Model Charge: "You are instructed that the amount of the expert witness's fee is a matter which you may consider as possibly affecting the credibility, interest, bias, or partisanship of the witness." *Model Jury Charges (Criminal)*, "Expert Testimony" (September 15, 2000). The logical nexus between a legitimate and reasonable expert's fee and the truthfulness of the expert is questionable. Indeed, a huge expert's fee that might seem shocking and suspicious to jurors can be entirely legitimate if it is generated by the amount of time and effort expended on a particularly difficult project. I see no reason why a jury should be factoring the size of an expert's fee into its credibility call unless there is evidence that the rate is not reasonable and customary for an expert of the sort; that the hours expended are inflated; or that the size of the fee evidences that it is in exchange for the substance of the opinion and not the work underlying it.

I would leave it to the Model Charge Committee to debate those issues and, if necessary, to develop a procedure for determining if and when the amount of a fee becomes relevant. The crucial point is that it is not relevant in every case.

Chief Justice PORITZ joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.