873 A.2d 554 (2004)
377 N.J. Super. 389
STATE of New Jersey, Plaintiff-Respondent,
v.
Terrence O'BRIEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 28, 2004.
Decided July 13, 2004.
*556 Yvonne Smith Segars, Public Defender, for appellant (Ruth Bove Carlucci, Assistant Deputy Public Defender, of counsel and on the brief).
John Kaye, Monmouth County Prosecutor, for respondent (Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Defendant, Terrence O'Brien, appeals his conviction after trial by jury on both counts of an indictment charging him with the purposeful or knowing murder, N.J.S.A. 2C:11-3, of his sister, Noreen O'Brien, and possession of a weapon for an unlawful purpose. N.J.S.A. 2C:39-4(d). After merging the weapons conviction into the murder conviction, defendant was sentenced to a term of life imprisonment with a thirty year period of parole ineligibility. This was defendant's second trial on these offenses; we reversed his prior convictions on both charges. Regrettably, we must again reverse and remand for a new trial. We conclude that the prosecutor engaged in an inappropriate and harassing line of questioning in his cross-examination of defendant's primary expert witness on the insanity issue, which was the sole issue on trial, thereby unfairly impugning the witness' credibility in the eyes of the jury. Despite timely objection to this line of attack, the trial judge permitted it to continue. We cannot find the resulting error harmless in the context of this "battle of the experts."
We will set out only so much of the tragic and horrific details of the crime as *557 are necessary for an understanding and resolution of the issue we find dispositive.
On January 11, 1993, defendant was released from the hospital after a nearly month-long stay for treatment of a chronic psychiatric illness. Shortly thereafter, defendant learned that his sister, Noreen, was pregnant and involved in a relationship with a Mexican man.
Laurie Bleefeld, a co-worker and close friend of the victim, testified that Noreen had gone on vacation to Cancun, Mexico in the spring of 1992. While there, she entered into a romantic relationship with a man she met in Cancun, Luis Hernandez. In the fall of 1992, Noreen again traveled to Cancun and returned to the United States with Hernandez. Noreen and Hernandez lived with Bleefeld for a short time until they found their own apartment. Bleefeld knew that Hernandez was in the United States illegally. She was concerned that Hernandez might have hepatitis because his skin and the whites of his eyes were "yellowish" and he "seemed to be dragging." Noreen became pregnant by Hernandez. She was excited about the pregnancy, discussed it with Bleefeld, and spoke about it openly at social gatherings.
On January 14, 1993, shortly before midnight, defendant summoned the police to his parents' home, stating that he needed to be transported to the hospital. Police Officer Daniel Murdoch, of the Middletown Township Police Department, picked defendant up at about 11:33 p.m. Defendant appeared depressed, but was dressed neatly and "otherwise calm." On the way to the hospital, defendant told Murdoch that "he was having dreams, bad dreams and hearing voices and he wanted to go [to the hospital] and speak with someone because he didn't want to hurt anybody." Murdoch left defendant with hospital security.
Shortly thereafter, defendant left the hospital "against medical advice," apparently before seeing a physician or a crisisunit worker. Defendant later explained that he left the hospital "because it was taking too long."
The following morning, January 15, defendant went to a friend's apartment where he drank coffee and removed two knives from a kitchen drawer. Noreen picked him up at his friend's apartment and they proceeded to the West End Post Office on Brighton Avenue in Long Branch. Defendant asked Noreen whether she knew what she was doing to their parents as a result of her relationship with Hernandez. They entered the post office between 11:00 and 11:30 a.m.
According to Adrienne Smith, a postal clerk, defendant looked "scary creepy ... because he had on a big heavy coat with his hands curled up." Noreen completed her transaction and then walked to one of the utility tables inside the post office. There were five or six customers in the post office at that time. Defendant left the post office by himself.
After most of the customers had left, defendant re-entered the post office. He approached the service window and bought two stamps from Smith, the only remaining postal employee. There was only one other customer present. After purchasing the stamps, defendant approached the tables where Noreen was working. Defendant stood behind her, blocking Smith's view of Noreen. Smith was assisting the other customer when she heard the victim say, "stop.... [Y]ou're hurting me." Smith tried to see what was happening but defendant was blocking her view. It looked like defendant was hitting the victim.
In fact, in full view of passersby, who could see the events through the front window of the post office, defendant stabbed his sister numerous times. *558 Eventually, an off-duty police officer entered the post office and managed to get defendant away from his sister and to drop one of the two knives he was holding. While the officer restrained defendant on the floor, defendant said, "I wouldn't hurt her, that's my sister. I love her."
Defendant was taken to police headquarters and processed. Because of a cut on his finger, the police took defendant to Monmouth Medical Center where his sister had also been taken for treatment. In the course of questioning at the hospital, defendant stated that he was upset with his sister, "that she was dating an illegal foreigner who had hepatitis, and he didn't want her to ruin the family in any way. So he had to take care of it and stop her." Defendant was examined by two psychiatrists at the hospital, one of whom recommended that he be taken to Trenton Psychiatric Hospital apparently based upon a suicide threat, defendant's need to be medicated and his general mental state.
However, rather than being taken to the Psychiatric Hospital, defendant was questioned by a Long Branch detective after being given his Miranda[1] warnings for a second time. The detective asked defendant what had happened. Defendant replied: "My sister is going with a foreigner. She wouldn't listen. I had to stop her." When asked why, defendant stated, "To keep the family together." When asked what the problem was with dating a foreigner, defendant replied: "He's a Mexican. He's in the country illegally. She's pregnant. He had hepatitis. The baby was going to be born sick." Napoletano asked defendant what he had done to stop his sister, defendant replied, "I don't know. I blacked out, and I don't want to talk about it." The detective described defendant's demeanor during questioning as "tense," "agitated," and "very edgy." He paced around the room and did not stay still. However, defendant's answers were responsive to the officer's questions, and he made no comments that were tangential to the subject matter discussed. Defendant appeared to "perfectly understand" everything that was said to him.
Throughout his stay at the hospital, defendant repeatedly asked the officers about his sister's status. When Noreen arrived at the emergency room, she had no pulse and was not breathing. The emergency trauma team managed to resuscitate her only after they surgically opened her chest and manually pumped her heart. She died in an operating room later that day.
When the officers learned that the victim had died, it was decided that defendant would not be told unless he again asked about her status. When defendant next asked about his sister's status, he was tense and edgy. However, when the detective told him that his sister had died, defendant visibly relaxed, sat down on a gurney, and appeared relieved. Defendant said: "Good, this is what I wanted to do." He then "made the sign of the cross" and added, "I'm happy. I'm in a good mood because that's what I wanted. I wanted to kill her."
At this juncture, the detective re-advised defendant of his Miranda rights and asked whether he understood them. Defendant responded, "yeah, I had to do it to save my family." Defendant was again asked whether he understood his rights, and he again confirmed that he did. When asked why he had to save his family, defendant stated that the victim went to Cancun and got involved with a Mexican, "an illegal alien." Defendant further explained that he "had to stop her," because "it was an *559 unhealthy baby" and "an unhealthy situation." Asked whether he followed the victim to the post office, defendant stated: "No, we went together. I had to do what had to be done." Defendant again made the sign of the cross and stated, "good. That's what I wanted." The detective asked defendant why he wanted that result, and defendant replied, "I told you, that's it."
An autopsy of the victim's body revealed that she had been stabbed thirty-three times. The medical examiner confirmed that the victim was two-months pregnant.
At trial, defendant relied upon an insanity defense. As his primary psychiatric expert, defendant presented Dr. Steven Simring. In addition, Dr. John J. Verdon testified as defendant's expert on surrebuttal. The State produced one expert, Dr. Timothy Michals. All three experts agreed that defendant had a mental illness; specifically, chronic paranoid schizophrenia. All three experts further agreed that defendant understood the nature and quality of his conduct when he stabbed and killed the victim. The experts also agreed that schizophrenic persons are capable of formulating criminal intent. Further, they agreed that a schizophrenic person is capable of strong emotions such as anger, jealousy and rage, just as are persons who are not mentally ill. The experts also agreed that a schizophrenic person's symptoms can be more or less severe at various times, and that a schizophrenic person can be deluded in one area of thought while intact in another.
The issue upon which the experts differed was whether defendant knew that stabbing the victim was wrong. The defense experts opined that defendant did not know his conduct was wrong, while the State's expert opined that he did. Thus, the issue for the jury was whether, at the time he killed the victim, defendant's illness was so acute or "out of control" that he did not know killing the victim was wrong, or whether, despite his illness, he did know the wrongfulness of his conduct.
There is no need to detail Simring's testimony, which was based on an interview he conducted with defendant in January 1994; his review of defendant's medical history as evidenced by hospital records dating from the early 1980s; psychiatric reports by various treating doctors; records of medications prescribed; police reports; witness statements; defendant's statements to the police; the autopsy report; and letters written by defendant prior to the offense. In Simring's view, at the time of the stabbing and for many years prior, defendant was suffering from chronic paranoid schizophrenia. He opined that at the time of the offense, defendant's illness was in a state of "flare-up," and that he was "acutely ill," "psychotic" and suffering from a profound thinking disorder. Defendant had been hospitalized for his schizophrenia in 1984, 1987, 1988 (for eighteen months), and 1991. Most recently, in 1992, defendant was twice admitted to hospitals as a result of delusions and agitation. In December 1992, about six weeks prior to the homicide, defendant was admitted to Jersey Shore Medical Center because of anxiety and delusional thinking. He complained of vision problems that he attributed to "Judge Milberg and Steven King, the author, [who] were putting substances into his eyes." Defendant was released from the hospital on January 11, 1993, four days prior to the stabbing. Upon his release, defendant first learned of the victim's pregnancy.
On January 15, 1993, hours before the stabbing, defendant went to the emergency room at Riverview Medical Center complaining of insomnia. Simring surmised *560 that hospital personnel "apparently wanted to admit him," but that defendant refused. Simring opined that defendant's insomnia and attempt to obtain relief by visiting the hospital were signs that his schizophrenia was "breaking through again." There was considerable other evidence upon which Simring also relied, including bizarre, delusional letters defendant wrote in 1986 and 1991, which need not be detailed. Simring concluded that defendant did not know it was wrong to kill the victim, because defendant "thought he was acting in a bizarre form of self defense." Defendant "genuinely did believe based on his internal psychotic thinking, that he was doing the right thing and the legal thing" when he stabbed and killed the victim. Simring acknowledged on cross-examination that notwithstanding defendant's statement to the police upon apprehension that the victim "was his sister" and he would not "hurt her," defendant knew that he had stabbed the victim and understood the nature and quality of his actions.
The State's expert, Michals, agreed that at the time of the stabbing, defendant suffered from a mental illness. However, in his view, defendant knew he was killing the victim and that causing her death was wrong. In formulating his opinion, Michals analyzed the police reports and witness statements, documentation of defendant's psychiatric history, hospital records, and information culled from his own examination of defendant on June 20, 1994. Again, we do not set out the great detail provided by Michals in support of his opinion.
The other defense expert, Verdon, interviewed defendant on June 23, 1999, and again on September 1, 1999, and found him competent to stand trial. Although defendant continued to suffer from paranoid schizophrenia at that time, he was receiving medication and was "relatively organized and intact."
During both interviews, defendant discussed his delusional beliefs concerning Judge Milberg and Steven King. However, defendant reported that he no longer felt that the judge was possessing his body.
Verdon testified that between the June and September interviews, defendant's thinking became more disorganized. He attributed this to the relatively low dosage of antipsychotic medication defendant was taking.
In forming his opinion that defendant did not know his actions were wrong, Verdon found particularly significant defendant's hospital visit the night before the stabbing, as well as his transfer to the Vroom Building shortly after his arrest. Verdon noted that in the commitment papers authorizing defendant's transfer to Vroom, Dr. Phillips, a psychiatrist at Monmouth Medical Center, described defendant as "an acutely psychotic man who had impaired judgment at the time and who was thought to be actively deluded having a fixed false belief." Also, in Verdon's opinion, the fact that defendant committed the stabbing in front of many witnesses, reflected the marked impairment of his judgment. Further, defendant's statement immediately after the stabbing to the effect that he loved his sister and would not hurt her, was indicative of his psychotic condition and demonstrated his ambivalence, a cardinal symptom of schizophrenia. According to Verdon, defendant's subsequent expression of relief upon learning of the victim's death, signified his "psychotic resolution" and also demonstrated that defendant did not know that it was wrong to stab the victim.
As noted, the jury rejected the insanity defense and found defendant guilty.
*561 On this appeal, defendant raises the following issues for our consideration:
POINT I
DEFENDANT'S ORAL STATEMENTS SHOULD HAVE BEEN SUPPRESSED BECAUSE THEY WERE NOT VOLUNTARY AND BECAUSE THE POLICE DID NOT SCRUPULOUSLY HONOR HIS RIGHT TO REMAIN SILENT
A. Miranda Hearing
B. The State Failed to Prove That Defendant Knowingly and Intelligently Waived His Miranda Rights Or That His Statements Were Voluntary
C. Defendant's Statement Should Have Been Suppressed Because the Police Did Not Scrupulously Honor His Right to Remain Silent
D. Defendant's Statement Made After He Was Told of His Sister' s Death Should Have Been Suppressed Because It Was Made After He Invoked His Right to Counsel and as a Result of The Inherently Compelling Pressure of Police Conduct
E. Conclusion
POINT II
THE PROSECUTOR'S MISCONDUCT DEPRIVED DEFENDANT OF A FAIR TRIAL AND DENIED HIM DUE PROCESS OF LAW. (Partially Raised Below)
POINT III
THE JUDGE'S REFUSAL TO DETERMINE THROUGH VOIR DIRE THAT PROSPECTIVE JURORS WERE WILLING AND ABLE TO ACCEPT THE FACT THAT PROCEDURES WERE IN PLACE TO PROTECT THE PUBLIC FROM THOSE DEFENDANTS FOUND NOT GUILTY BY REASON OF INSANITY DEPRIVED DEFENDANT OF HIS RIGHT TO DUE PROCESS OF LAW AND THE RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10
POINT IV
DEFENSE COUNSEL'S INEXPLICABLE AND CRIPPLING COMMENT IN SUMMATION THAT DEFENDANT WAS "TOO DANGEROUS" TO MERIT CONSIDERATION OF THE DIMINISHED CAPACITY DEFENSE, AND THAT DEFENDANT "DOESN'T DESERVE TO BE FREE," CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL. U.S. Const., Amends. VI & XIV; N.J. Const. (1947), Art. I, par. 10
POINT V
THE COURT ERRED IN INSTRUCTING THE JURY THAT IF IT FOUND DEFENDANT NOT GUILTY BY REASON OF INSANITY, HE MIGHT, OR MIGHT NOT, BE COMMITTED TO A MENTAL INSTITUTION. (Not Raised Below)
POINT VI
THE TRIAL COURT'S REFUSAL TO ALLOW DEFENDANT TO BE REEVALUATED TO DETERMINE WHETHER HE REMAINED COMPETENT THROUGHOUT THESE PROCEEDINGS VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS
POINT VII
THE TRIAL COURT'S ANSWER TO A JURY QUESTION REQUESTING TO REVIEW DEFENDANT'S MEDICAL RECORDS WAS INADEQUATE, MISLEADING, AND HIGHLY PREJUDICIAL AND THEREBY DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL
POINT VIII

*562 DEFENDANT'S SENTENCE IS EXCESSIVE
[At the direction of the court pursuant to R. 1:36-3, the discussion of issues raised under Points I, IV, V, VI, VII and VIII have been redacted from the published version of this opinion.]

* * * * *

II
As part of his argument that he was deprived of a fair trial by reason of improper prosecutorial conduct, defendant contends that the prosecutor's cross-examination of Dr. Simring served to unfairly disparage his psychiatric expert, thereby undermining his defense.
The following facts are relevant to the analysis of this argument. At the first trial, defense counsel questioned Simring regarding the basis of his expert opinion that defendant's act of stabbing his sister was the direct product of his mental illness. In relating various aspects of defendant's background that he had considered in formulating his opinion, Simring stated that defendant was unable to join the Marines because of "his criminal history." It was revealed that when defendant was twenty, he assaulted the brother of a former girlfriend when she refused to see him. Simring subsequently stated that he was unable to form an opinion as to whether or not defendant was suffering from schizophrenia at the time of that assault, or whether such an illness had any role in his commission of that crime, noting that defendant had not yet been diagnosed. However, he would not rule out the possibility that defendant was suffering from schizophrenia at that time and he stated that the assault was part of a "suggestion of an impending psychiatric problem" and that "there might have been some ... preliminary signs."
On his prior appeal, defendant argued that the testimony regarding his criminal record, including the factual basis underlying the assault conviction, was improperly admitted into evidence. State v. O'Brien, No. A-7308-95T4 (App.Div. Feb. 18, 1999), slip op. at 2-3. We did not address this issue other than to observe that in the course of his direct examination of the expert witness, defense counsel elicited evidence of defendant's 1980 conviction of aggravated assault, arising from the incident described above, as well as other evidence of prior convictions. Id. at 7. There was also testimony that defendant was hospitalized for treatment of a psychiatric condition in 1984, while still incarcerated for this crime. Ibid. We stated that we were "sure the doctor's testimony could have been guided to avoid reference to such plainly prejudicial evidence," and noted, that "at the least, it should have been accompanied by a carefully tailored limiting instruction." Ibid. Finally, we stated that "[b]ecause there must... be a new trial ... a more effective assistance of counsel might preclude some of the more damaging evidence" introduced by the defense. Id. at 4.
Consequently, at the retrial it was agreed that all references to defendant's prior convictions by the experts would be precluded. Cognizant of this restriction on his testimony, Simring did not mention defendant's 1980 assault conviction when testifying on direct examination regarding the basis of his opinion. Instead, in relating the significant aspects of defendant's history, Simring stated that defendant came from an "achieving family," yet, unlike his three siblings, he dropped out of high school and "tried to join the U.S. Marine Corps but he couldn't do so."
Defendant now takes issue with the following excerpts from the prosecutor's ensuing cross-examination of Simring:

*563 Q. You also made mention, Dr. Simring, when you were discussing I believe the defendant's history, you made mention of the fact that he tried to enlist in the Marine Corps, correct?
A. Yes.
Q. And that he couldn't, correct?
A. Right.
Q. However, of course it had nothing to do with his mental illness or the schizophrenia that he was rejected from the Marine Corps, correct?
A. I don't know that.
Q. Well, Doctor, do you remember at any time saying that there were other reasons why he was rejected at any point?
A. I listed some reasons, yes.
Q. That were other than illness, correct, Doctor?
A. I listed some reasons, yes.
Q. And you listed those as the reasons, correct, Doctor, previously?
A. Well, I list 
In response to defense counsel's request for a sidebar, the trial judge stated: "This is cross-examination. You have [a] chance for redirect." The following discussion then ensued at sidebar:
THE COURT: It seems like a very simple cross-examination. You know, if the jury's left with the impression that he was rejected from the Marine Corps because of his schizophrenia that's one thing. If the impression has been left[,] it's a topic of cross-examination that there were other reasons why unrelated to schizophrenia. I mean it's appropriate cross.
[DEFENSE COUNSEL]: I don't think we should get into the specifics of the prison record as the reason and that's why I'm here.
THE COURT: Thank you.
[PROSECUTOR]: I have no intention of bringing that topic up unless his previous answer is he was rejected because of his criminal record. He didn't mention mental illness.
I want him to say  show him the transcript, I'd like him to say that, show him the transcript but I'm not going to bring up the topic in my question. If it gets to that point, we'll come to side bar and 
THE COURT: That's why he said, yes, he listed other reasons. He's sensitive to the fact that he should not blurt out what we have carefully 
[DEFENSE COUNSEL]: Exactly.
[PROSECUTOR]: But the problem is there weren't other reasons it was one reason.
THE COURT: Which was?
[PROSECUTOR]: The record. That's what he said, not me, he said in his testimony.
[DEFENSE COUNSEL]: He said there could have been other reasons.
[PROSECUTOR]: That's not what he said is my point. I'm asking about a previous answer, and I'm allowed to cross-examine about the previous answer. I will not bring out the prejudicial comment or the content. But the bottom line is he gave one answer and one answer only as a reason previously for the rejection from the Marine Corps.
[DEFENSE COUNSEL]: How is this material to the issues in front of this jury?
[PROSECUTOR]: One of the issues before this jury is credibility of this witness. They have to determine, whether or not, despite the fact that he's an expert, whether or not he is reliable.
The court ruled that the prosecutor could continue with this line of questioning, with the restriction that there would *564 be no mention of defendant's prior conviction. The following ensued:
Q. Doctor, in terms of the Marine Corps in your previous answer, you gave one reason and one reason only for his rejection, correct?
A. I'm not sure. I'm sure I gave a reason in my previous answer in direct testimony.
The prosecutor then showed Simring his testimony from the first trial and asked:
Q. And in that portion of your sworn testimony have, as you've described it, you indicate the defendant tried to join the Marine Corps, correct?
A. I did.
Q. You also indicate the reason, without telling us what it might have been, is that he was rejected, correct?
A. Yes, I did. I thought you were referring to testimony today; but yes, I did indeed state a reason.
Q. I stated previously not today.
THE COURT: That's the answer. He stated a reason.
A. In my testimony four years ago I stated a reason.
Q. And it was one reason, correct, that you stated at that time, correct?
A. That's right.
Q. And that it had nothing absolutely to do with mental illness, correct?
A. That is not true.
Q. Your answer does not mention mental illness, does it?
A. My answer to that question in my 140 pages of testimony were tied into other answers and that reason that I gave was itself, in my opinion, related to mental illness at that time.
Q. Does it use the phrase mental illness?
A. Counsel, would you like me to read this?
THE COURT: No. No. Let's keep this in focus.
....
THE COURT: It's an adversary process, Doctor, I'm not criticizing you in any way. Just have to abide the event. He's entitled to cross in his method. Your attorney will certainly supplement the question with other records.
[SIMRING]: I might need an instruction from the Court.
Defense counsel renewed his objection to this line of questioning on the ground of relevance, but was again overruled. The prosecutor continued:
Q. Doctor, when you were listing the history at that previous time, sworn testimony, you mentioned defendant tried to join the Marines but was not allowed to and you list a specific reason, correct?
A. I did.
Q. In that testimony?
A. I did indeed.
Q. And that specific reason wasdoes not use the words mental illness, schizophrenia or any other psychiatric term, correct?
A. That is correct.
Q. That's all I asked, Doctor, please.
A. In that sentence out of context that specific reason.
PROSECUTOR: Your Honor, can I ask the Court to direct the witness to answer the question and answers only.
THE COURT: The answer was it does not use those words. If there's reason to explain that, I'm sure [defense counsel] during redirect will ask the appropriate question.
At this point, the prosecutor moved on to a new line of questioning. However, during the next break in Simring's cross-examination, Simring asked the judge to *565 provide him with an instruction regarding the proper parameters of his responses to the prosecutor's repeated questions concerning defendant's rejection from the Marines. In addition, Simring complained that although he had "been asked by defense counsel to redact large portions of my report based on the Appellate Division decision," the prosecutor's questioning was "making it look as if [he was] not credible or hiding things...." Simring explained that he resisted answering the prosecutor's questions because it was his "suspicion that the 1980 assault was because of an undiagnosed mental illness." Defense counsel renewed his objection and noted that the entire line of questioning was irrelevant to the issue of defendant's sanity at the time of the incident herein.
In an oral ruling encompassing four pages of the transcript, the judge explained his rationale for overruling the defense objections and not issuing any curative instruction. Essentially, he found that Simring's direct testimony "left the inference that [defendant] was rejected because of a mental disease... to corroborate Dr. Simring's opinion," and that the prosecutor's cross-examination was appropriate to negate this inference. The judge did not agree with Simring's claim that his credibility had been adversely and unfairly affected. Rather, based upon his own observations of the proceedings, the judge found that the challenged cross-examination, which only "took a matter of seconds" following two hours of Simring's testimony, did not "have any material consequence to the jury's overall ability to make reasonable judgments as to credibility." Like the prosecutor, the judge had initially assumed that since Simring testified at the first trial that the Marines rejected defendant because of his criminal record, Simring would respond in the affirmative when asked if defendant was rejected for reasons unrelated to any psychiatric illness. He further explained that "[w]hat no one could anticipate was that [Simring] related the prior aggravated assault in 1980 to a mental condition. So his ... answer perhaps was that the rejection was for criminal history, yes, but that prior criminal history was ... related to defendant's mental disease."
Defendant also refers to the following summation remarks by the prosecutor:
Simring does what Simring wants to do, and he doesn't care about anything else, and I submit to you that came out in terms of his demeanor and the way he did things.
He wouldn't concede even the most obvious questions. They weren't trick questions. They weren't surprise questions.
If I asked him: His suit was black that day, he would have said: You don't understand, you have to take into consideration the concept of the defendant's prior medical history and whether or not he prefers black. He wouldn't answer anything straight up.
....
He does what he wants to do. He's not a reliable witness. He wouldn't answer questions straightforward. He doesn't do things in a professional manner.
Defendant contends that this line of cross-examination, as well as the related summation remarks, were improper because they were designed to make his expert appear deceitful and the defense of insanity a sham.
Pursuant to N.J.R.E. 611(b), "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." We acknowledge that "[c]onsiderable latitude is customarily allowed *566 in the cross-examination of a witness," and the trial court is vested with particularly "broad discretion to determine the proper limits of cross-examination" where the credibility of a witness is at issue. State v. Steele, 92 N.J.Super. 498, 503, 224 A.2d 132 (App.Div.1966). "Additionally, as a general rule, any fact which bears against the credibility of a witness is relevant to the issue being tried, and the party against whom the witness is called has a right to have that fact" presented to the jury to aid them in determining credibility. State v. Pontery, 19 N.J. 457, 472, 117 A.2d 473 (1955). Despite these general principles, we conclude that the prosecutor's cross-examination of Simring in the manner quoted above went well beyond the bounds of proper questioning, and, with the court's approval, degenerated into badgering of such a degree as to unfairly undermine the credibility of defendant's main expert witness, indeed his main witness.
The record is quite clear that in his testimony at the first trial Simring did suggest that there might be a tie between defendant's assault conviction, that directly led to his Marine Corps rejection, and his subsequently diagnosed mental illness. While it is true that on direct examination in the first trial, in the course of reciting defendant's history, Simring stated that defendant "tried to join the Marines, was not allowed to because of his criminal history," on redirect examination, he testified that at the time of the 1980 assault, "there's suggestion of an impending psychiatric problem, but he had not been hospitalized and there's no evidence that he had yet at that point been diagnosed." Nevertheless, the doctor went on to state that he could not rule out the possibility that defendant was suffering from an underlying psychiatric condition at the time of the assault. "[I]n retrospect ... [o]ne can pick up signs and symptoms which suggest that there may have been something more wrong than just a boyfriend/girlfriend fight. But it's hard to go back and do this at that point." Finally, he noted that while there might have been "some proemial or preliminary signs [at the time of the 1980 assault]," there was no documentation that defendant "had delusional bizarre ideas, overtly bizarre ideas about any of the individuals involved in that crime." On recross, in response to further questioning about the 1980 crime, Simring stated that "in retrospect, to scope, looking backward as you look at this crime, there were elements that you could say even then suggested that there might be something wrong with this young man. Even lay witnesses."
Thus, the trial judge's statement, in justification of his ruling that the cross-examination was proper, that "no one could anticipate ... that [Simring] related the prior aggravated assault in 1980 to a mental condition," was in error. Indeed, in seeking the judge's intervention Simring himself told the judge that he had so testified in the first trial. From the prosecutor's questioning, it is clear that he had reviewed the testimony at the first trial at which he had also been the prosecutor. As a result, his suggestion that Simring had not testified to a possible relationship between the criminal conviction and mental illness represented at best a misrecollection, at worst an intentional misrepresentation.
The witness' reluctance, indeed inability, to answer the prosecutor's question in simple yes or no terms was, in our view, justified. However, rather than intervene to protect the witness from an unfair inference that he was unwilling to answer the questions, when in fact he was attempting to abide by a court ruling, the judge placed his imprimatur on the unfair line of cross-examination and allowed it to continue unchecked. *567 Simring's reference to the Marine Corps was brief and, if allowed to pass, likely inconsequential. The prosecutor, however, with the judge's sanction, was permitted to make the proverbial mountain out of a molehill. The defense objected and even requested a curative instruction, to no avail. This was error.[2]
We cannot determine how much the Marine Corps incident may have affected the jury's evaluation of Simring's credibility and, consequently, of his opinions. For all that appears, when the prosecutor told the jury that Simring would not "concede even the most obvious questions," would not "answer anything straight up," would not "answer questions straightforward," the jury may well have had this line of questioning in mind. Of course, in his charge, the judge delivered the standard instruction that in judging a witness' credibility "you may ask yourselves whether he or she seems to be straightforward and forthright or whether he or she did not. Did the witness strike you as being fair and candid." That charge, in the context of the prosecutor's cross examination and summation, leaves us unable to conclude that the jury was not affected by the prosecutor's improper conduct.
Improper conduct by the prosecutor that unfairly tarnishes a defense expert cannot be countenanced. State v. Smith, 167 N.J. 158, 182-85, 770 A.2d 255 (2001). When, as here, a defendant's guilt depends "entirely on which experts the jury believed," id. at 187, 770 A.2d 255, we conclude, as did the Court in Smith, "that the inappropriate [conduct] by the prosecutor could have improperly swayed the jury and denied defendant a fair trial." Ibid. See also State v. Farthing, 331 N.J.Super. 58, 79, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000). Unlike our dissenting colleague, we reject the State's suggestion that any error was harmless. It is no answer to suggest that the evidence was adequate to support the jury's verdict. Indeed, even if the evidence were overwhelming, which it was not, at least on the insanity issue, that "could never be a justifiable basis for depriving a defendant of his or her entitlement to a constitutionally guaranteed right to a fair trial. The impact of violating a defendant's right to a fair trial cannot be measured by or weighed against, the quantum of evidence bearing upon his or her guilt." State v. Frost, 158 N.J. 76, 87, 727 A.2d 1 (1999). In this case, there was timely objection to the line of inquiry, the questioning was not withdrawn, nor did the court instruct the jury to disregard the objectionable material. Id. at 83, 727 A.2d 1. See also State v. Pillar, 359 N.J.Super. 249, 278-79, 820 A.2d 1 (App.Div.), certif. denied, 177 N.J. 572, 832 A.2d 322 *568 (2003)(the proper inquiry is whether the objectionable material could have influenced the jury). Rather, the misconduct we have identified had the clear capacity to substantially prejudice defendant's right to have the jury fairly evaluate the merits of his insanity defense. The fact that the incident was brief, when viewed in light of the entire trial, is of no moment.

* * * * *

III
Defendant claims that the court erred in refusing to ask potential jurors on voir dire whether they could accept that, if defendant were acquitted by reason of insanity, procedures were in place to provide for defendant and to protect the public's safety. In defendant's view, this ruling was error because it "unfairly interfered with [his] ability to make informed challenges" given our Court's "acknowledged concern over society's ability to consider insanity a viable defense."
Prior to jury selection, defense counsel urged the court to ask potential jurors on voir dire whether they could accept that, if defendant was found NGRI, procedures were in place to provide for defendant in order to protect the public's safety. The trial judge declined to ask this question, reasoning that it was inappropriate to interject a post-judgment dispositional issue, which was outside the jurors' adjudicative function, into the preliminary voir dire examination. He also found that the question was unnecessary to expose bias, and noted that the public safety issue would be adequately addressed in the final charge.
In its final charge, the court instructed the jury that "procedures exist to adequately provide for the defendant and to protect the public in the event defendant is found not guilty by reason of insanity."
It is well established that "an impartial jury is a necessary component of a fair trial." State v. Papasavvas, 163 N.J. 565, 584, 751 A.2d 40, mod. on other grounds, 164 N.J. 553, 753 A.2d 1148 (2000). "The purpose of voir dire is to ensure an impartial jury" by detecting jurors who cannot fairly decide a matter because of partiality or bias. State v. Martini, 131 N.J. 176, 210, 619 A.2d 1208 (1993); State v. Manley, 54 N.J. 259, 281-83, 255 A.2d 193. A probing voir dire aids the trial court in disclosing "cause" for dismissal of prospective jurors, and assists the parties in exercising peremptory challenges. State v. Horcey, 266 N.J.Super. 415, 421, 629 A.2d 1367 (App.Div.1993).
"Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and `its exercise of discretion will ordinarily not be disturbed on appeal.'" Papasavvas, supra, 163 N.J. at 595, 751 A.2d 40 (citations omitted). "[T]here is no particular litany required for the jury voir dire," and the court is not obligated "to ask any particular question or indulge the defendant's requests absolutely." State v. Lumumba, 253 N.J.Super. 375, 393-94, 601 A.2d 1178 (App.Div.1992). Appellate review is generally limited to determining whether "the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury." State v. Biegenwald, 106 N.J. 13, 29, 524 A.2d 130 (1987); State v. Loftin, 287 N.J.Super. 76, 103, 670 A.2d 557 (App.Div.), certif. denied, 144 N.J. 175, 675 A.2d 1123 (1996).
In support of his claim that the voir dire was inadequate, defendant relies primarily on State v. Moore, 122 N.J. 420, 429, 585 A.2d 864 (1991), where the defendant was found guilty of capital murder for the "hammering killing" of his pregnant wife and their eighteen-month-old child. *569 There, the trial court declined to inquire regarding the jurors' willingness and ability to consider an insanity defense, among other things. Id. at 453-56, 585 A.2d 864. Although the defendant's conviction was reversed on other grounds, the Court offered guidance on the conduct of voir dire where an insanity defense is raised. Ibid. In this regard, the Court observed that "it is well established that many laypersons have a great deal of difficulty in understanding the insanity defense, and many people might not be able to consider it as a viable defense, particularly to such a heinous act as the killing of a wife and child." Id. at 453-54, 585 A.2d 864. Accordingly, an appropriate voir dire should endeavor to "screen out prospective jurors who could not consider an insanity defense due to their prejudices or biases against it." Id. at 454, 585 A.2d 864. Inquiry may be made to determine "whether a juror can judge the testimony of psychiatric witnesses by the same standard that he or she would apply to the testimony of any other witness." Ibid.
For further guidance, the Court referenced our opinion in Murray, supra, 240 N.J.Super. at 392, 573 A.2d 488. Moore, supra, 122 N.J. at 454, 585 A.2d 864. The Court in Moore noted that the trial court in Murray "rejected several voir dire questions proposed by the defendant and instead asked its own questions, which probed whether the prospective jurors had read or studied about psychology, psychiatry, medicine, or related fields, and inquired about the jurors' views on those sciences and whether those views would hinder their ability to follow the law as instructed by the court." Ibid. According to the Court, in asking only these questions, "the trial court in Murray acted properly within its discretion and sufficiently determined any juror bias or prejudice." Ibid.; see also State v. Jasuilewicz, 205 N.J.Super. 558, 569, 501 A.2d 583 (App.Div.1985), certif. denied, 103 N.J. 467, 511 A.2d 649, (1986)("searching" judicial inquiry on juror attitudes toward insanity defense required in circumstances of the case).
Similar to the questions approved of in Murray, the trial judge here asked the jurors (1) whether they had "any education in psychology or psychiatry beyond the standard High School or college courses," and (2) whether they could "accept the concept that psychiatry is a credible medical science" or, not accept it "as a result of any life experience or otherwise." The court went beyond the questioning deemed sufficient in Murray, by further inquiring whether any juror, family member or acquaintance had "[a]ny good or bad experience with a psychologist or psychiatrist ... that would possibly influence [his or her] ability to fairly weigh and judge such expert opinions?" The court also inquired whether there was any juror that could not "follow the law when it provides that insanity is a potential defense to a criminal act[.]" Additionally, the court advised the jurors that they would have to "apply the law of the case despite personal feelings" they "might have" about it; the court questioned whether anyone had a "philosophical problem with that concept"; and the court posed the open ended question whether the jurors "harbor[ed] any private reason at all, as a result of any life experience or otherwise" that could cause partiality.
We conclude that the foregoing voir dire questions adequately addressed the concern in Moore that jurors be asked questions to ascertain their ability to fairly and impartially consider insanity as a defense. Moore, supra, 122 N.J. at 454, 585 A.2d 864. Furthermore, like the voir dire in Murray, the questions sufficiently probed the jurors' attitudes and potential prejudices toward mental health sciences, professionals, *570 and mental defenses. The court properly limited the voir dire to questions designed to discern whether the jurors held "biases that would interfere with their ability" to follow the law and fairly decide the issues that would be posed for their determination. Martini, supra, 131 N.J. at 210, 619 A.2d 1208.
Defense counsel's proposed question, regarding whether jurors could "accept the proposition that procedures are in place to protect the public," was not instrumental to expose potential bias. Thus, the trial court soundly exercised its discretion in refusing to pose defense counsel's proposed "public safety" question. See, e.g., Murray, supra, 240 N.J.Super. at 393, 573 A.2d 488 ("[w]hether or not to inquire of prospective jurors about attitudes concerning substantive defenses or other rules of law which may become implicated in a trial or in the charge is within the discretion of the trial court").
In sum, consistent with Moore and Murray, the jury voir dire was sufficiently probing and thorough to secure an unbiased jury.

* * * * *
Reversed and remanded for a new trial.
CARCHMAN, J.A.D., dissenting.
I respectfully disagree with the conclusion reached by my colleagues as to the impact of the cross-examination of Dr. Simring and the judge's failure to sustain defense counsel's objections to the cross-examination. Accordingly, I dissent, in part. As to the other issues raised, I join with the majority.
The majority concludes that the confrontation of Dr. Simring with his prior testimony regarding defendant's inability to join the Marines was so unfair as to deny defendant's right to a fair trial. While I agree that the prosecutor was walking a fine line when confronting the witness as to his prior testimony and his reasons for concluding that defendant was rejected by the Marines, the inquiry was proper to demonstrate that the witness had earlier opined that the reason for such rejection was not mental illness but some other unidentified reason. The "other" reason was defendant's prior record, an area of inquiry that we had proscribed in our prior decision reversing the conviction.
The prosecutor's cross-examination consisted of narrow, directed and pinpoint questions that could have been answered "Yes" or "No." The inquiry was whether "mental illness" was identified as a basis for the rejection. The prosecutor never mentioned or alluded to defendant's prior record. The judge correctly observed that if further clarification was required, counsel could address the issue on redirect examination.
This was in my view a classic example of use of prior testimony for impeachment purposes, N.J.R.E. 613, and the prosecutor carefully phrased the inquiry to avoid mention of defendant's prior record. That the witness suggested to the judge during colloquy that his "140 pages of testimony were tied into other answers and that reason that I gave was itself, in my opinion, related to mental illness at that time," was an answer to a question that was not asked. The witness was asked specifically whether he cited mental illness as a basis for the rejection. He did what experts are adroit at doing and that was not responding to the question but deflecting to the "140 pages" of his prior testimony. The question was proper and not prosecutorial misconduct.
I note further that this issue and the exchange came in the context of an extended trial where defendant's sanity was in issue. I cannot agree that this brief and *571 fleeting exchange, even with the later commentary by the prosecutor during summation challenging Dr. Simring's credibility, was such as to deprive defendant of his right to a fair trial.
I need only cite the same authority as do my learned colleagues regarding the significance of cross-examination, State v. Pontery, 19 N.J. 457, 472, 117 A.2d 473 (1955) (discussing the limits of cross-examination as encompassing any fact which bears on the credibility of a witness); State v. Steele, 92 N.J.Super. 498, 503, 224 A.2d 132 (App.Div.1966) (vesting the trial judge with broad discretion to determine the proper limits of cross-examination). I conclude that the cross-examination was narrowly conceived, was fair and appropriate and did not amount to misconduct on the part of the prosecutor or error by the judge. Even if there was such misconduct or error, I cannot agree that any perceived misconduct or error precluded defendant from receiving a fair trial.
As to this issue, I dissent; in all other respects, I concur with the thoughtful and thorough opinion of the majority.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).
[2] We respectfully disagree with our dissenting colleague's suggestion that that prosecutor "was walking a fine line" in his questioning of Simring. In our view, he crossed over the line separating vigorous but proper cross-examination from an improper over-zealous attack. Nor is it fair to suggest that Simring could have answered the prosecutor's questions with a simple "yes or no," and "that if further clarification was required, counsel could address the issue on redirect examination." We do not perceive how defense counsel could have clarified the issue on redirect, presumably by eliciting Simring's redirect from the first trial, without getting into the 1980 conviction, a topic that properly had been barred. However, without bringing up the conviction, all the "Marine Corps incident" answers from that first trial would be left floating without a context within which the jury could understand and evaluate them. We disagree with the view that Simring was doing "what experts are adroit at doing." Rather, in the context of complex psychiatric testimony, we find the witness' answers and conduct to have been consistent with his prior testimony while avoiding mention of the prior conviction.