NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1444-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

R.A.M.,[1]

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **September 29, 2025**
>
> **APPELLATE DIVISION**

Argued September 9, 2025 – Decided September 29, 2025

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 22-06-0989.

Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the brief).

Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica de Outeiro, of counsel and on the brief).

---

[1] We use initials and pseudonyms to protect the privacy of the victim. See R. 1:38-3(c)(12).

The opinion of the court was delivered by

PEREZ FRISCIA, J.A.D.

After a jury trial, defendant R.A.M. appeals from his second-degree aggravated assault conviction under N.J.S.A. 2C:12-1(b)(13) and resulting six-year prison sentence. Defendant contends reversal of his conviction is warranted because the prosecutor committed misconduct during summation. He also challenges the trial court's imposed sentence, arguing the court: erroneously applied aggravating factor fifteen, N.J.S.A. 2C:44-1(a)(15); impermissibly considered dismissed charges in applying aggravating factors; and failed to explain the weight assigned to each aggravating factor.

Defendant's aggravating factor fifteen argument raises a question of first impression. We are asked to consider whether the court engaged in impermissible double counting in finding factor fifteen applied.

For the reasons that follow, we affirm defendant's conviction because the prosecutor's summation did not amount to plain error depriving defendant of a fair trial. We hold that the court's application of aggravating factor fifteen did not constitute impermissible double counting because, although defendant's underlying offense also required a finding that he acted against a domestic violence victim, the court separately determined, pursuant to N.J.S.A. 2C:44-1(a)(15), that the State established defendant had committed a prior act of

domestic violence. Further, we conclude the court did not improperly consider defendant's dismissed charges and sufficiently provided its reasons for the sentencing factors.

I.

We derive the following facts from the evidence presented at the four-day jury trial resulting in defendant's aggravated assault conviction for strangulation of a victim of domestic violence. D.P., defendant's former girlfriend, testified that she dated defendant between October 2020 and August 2021. In 2021, defendant was fifty-nine years old, and D.P. was sixty-five years old.

On the morning of August 15, while defendant was at D.P.'s Asbury Park residence, he was acting "very jealous." He suspected D.P. was cheating on him and demanded to know her whereabouts the day prior. D.P. denied being unfaithful and explained she went to lunch with her sons. Defendant accused D.P. of lying. After D.P. provided the lunch receipts defendant requested, he "calmed down." Later the same morning, they traveled to an urgent care facility near defendant's Wall Township residence and registered for COVID-19 appointments. Thereafter, they purchased breakfast and drove to defendant's home.

A-1444-23

After arriving at defendant's home at around 9:00 a.m., defendant confronted D.P., stating, "[Y]ou think you[ are] in control, you[ a]re not in control," and "I[ a]m going to show you what control is." She watched defendant throw a metal bar on the floor, "parallel to where the [front] door would open." As D.P. attempted to move the bar to leave, defendant pushed her onto a loveseat, "put his palm over [her] nose[,] and clasped [her] chin shut" with his index finger and thumb, preventing her from breathing. D.P. began screaming once defendant removed his hand. Defendant again then pushed her back onto the loveseat, smothered her, and stopped her from breathing. He yelled "at [her] to stop screaming." D.P. remembered that once he stopped, she again attempted to leave and heard defendant's footsteps behind her as she reached the door.

She recalled regaining consciousness while lying on the floor and going to sit down. Defendant then threatened D.P., took her phone, and threw her purse against the wall. Because they received a call to return for the test appointments, defendant returned her phone, and they went to the urgent care facility. D.P. informed defendant she was leaving the urgent care facility and used her phone to order a "priority" car. After arriving home, she and her son went to the hardware store for new house locks. She later took photographs of

A-1444-23

her injuries, including her "fat lip" and a "tooth mark" indent in her mouth. Defendant called D.P. multiple times.

The next day, D.P. reported the incident to the Asbury Park Police Department and met with Officer Andrew Slinger. Slinger testified that D.P. provided photographs, receipts, text messages, defendant's phone call history, and a formal written statement. Later the same day, defendant was criminally charged and arrested. On June 21, 2022, a Monmouth County grand jury indicted defendant for: second-degree aggravated assault (smothering), N.J.S.A. 2C:12-1(b)(13); and third-degree terroristic threats, N.J.S.A. 2C:12-3(b).

At trial, the State, in addition to calling D.P., also presented the testimony from Slinger, and Antoinette Geran, a forensic nurse examiner. Defendant's witnesses included Dr. Anoop Kotwal, an emergency room physician, and Dr. Edward Gosselin, an emergency medicine and asphyxiation expert.

Geran testified to receiving specialized strangulation and smothering training. She had completed "five or six" similar forensic examinations before examining D.P. and had completed a total of fourteen examinations before the trial. During D.P.'s physical examination at Jersey Shore University Medical Center (medical center), Geran noted D.P. exhibited symptoms of: a headache,

"ringing" ears, dizziness, confusion, sleeplessness, and loss of appetite. Geran photographed D.P. and observed she had a "laceration on the right lower lip inferior to the cut on the outside and small abrasions to the bottom inner lip fold," as well as "a cut to the left side of her nose, a pinpoint cut on her left cheek[,] and an abrasion with swelling to the right lower lip." In "around half" of Geran's previously completed forensic examinations, she had found "visible injury." She testified that "usually if there [wa]s a report of smothering, there could be injuries to the mouth." Geran also found "vascular congestion to both of [D.P.'s] eyes" and a "purple bruise" on D.P.'s right forearm. Geran noted D.P. was taking anti-depressant and blood-thinner medications at the time of her examination.

Dr. Gosselin testified that he practiced emergency medicine for almost thirty-four years, was trained to handle "ligature . . . issues," "airway obstruction, [and] airway asphyxiation," ran an expert consulting business for seven years, and examined "several" victims of smothering throughout his career. Dr. Gosselin disagreed with Geran's opinion regarding D.P.'s injuries and believed Geran's photographs showed no "evidence of attempted asphyxiation," abrasions, or scratches on D.P. Within "a reasonable degree of medical certainty," he opined D.P.'s allegations were not "consistent with the evidence presented." Dr. Gosselin concluded D.P.'s injuries were a possible

6                                                                                    A-1444-23

side effect of her anti-depressant and blood-thinner medications. During defense counsel's direct examination, Dr. Gosselin acknowledged defendant was paying him $495 per hour for his work on this matter.

Dr. Kotwal testified that he examined D.P. at the medical center immediately prior to Geran. D.P. had gone to the medical center for an evaluation based on a referral from the Monmouth County Prosecutor's Office. Dr. Kotwal reported D.P. had no injury complaints, and the examination showed nothing "unusual" or "worrisome." He explained that he would ordinarily defer to Geran's examination findings regarding "minor injuries, scrapes, bruises, bumps, [and] lumps."

During summation, the prosecutor addressed Dr. Gosselin's testimony and commented that:

> [Dr. Gosselin] disregarded or disagreed with the forensic nurse's evaluation . . . .
>
> . . . Why would [Dr. Gosselin] disagree with that? Because he[ is] paid to, right? He[ is] here for a reason. He was hired to author a report for the benefit of . . . defendant. When we[ a]re talking about credibility and bias, it[ is] a pretty strong one.
>
> [(emphasis added).]

Defendant did not object to the statement.

On October 13, the jury found defendant guilty of second-degree aggravated assault for smothering D.P., a victim of domestic violence, but

7                                                                      A-1444-23

acquitted him of terroristic threats. On December 22, the court sentenced defendant. The State requested the court sentence defendant to an eight-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The State argued the court should find aggravating factors: three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6) (defendant's prior criminal record and the seriousness of the offense); nine, N.J.S.A. 2C:44-1(a)(9) (need to deter); twelve, N.J.S.A. 2C:44-1(a)(12) (defendant knew or should have known that a victim was sixty years or older); and fifteen, N.J.S.A. 2C:44-1(a)(15) (the offense involved an act of domestic violence and defendant committed at least one act of domestic violence on more than one occasion).

Defendant had a history of engaging in domestic violence. Prior to defendant's August 2021 assault, he had committed separate acts of domestic violence against multiple prior romantic partners, and they had active final restraining orders (FRO) against him.

Defendant asked the court to find mitigating factors: six, N.J.S.A. 2C:44-1(b)(6) (defendant will compensate the victim or will participate in a program of community service); seven, N.J.S.A. 2C:44-1(b)(7) (defendant's lack of criminal history); eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur); nine, N.J.S.A. 2C:44-1(b)(9)

A-1444-23

(defendant's character and attitude indicate he is unlikely to commit another offense); ten, N.J.S.A. 2C:44-1(b)(10) (defendant is particularly likely to respond affirmatively to probationary treatment); and eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment would entail excessive hardship to himself or his dependent).

The court imposed a six-year prison term, subject to an eighty-five percent period of parole ineligibility under NERA. After the court recounted defendant's "substantial criminal history" and "history of domestic violence," including a number of charges that had been dismissed, it addressed the applicable aggravating and mitigating factors pursuant to N.J.S.A. 2C:43-2(e). The court found aggravating factors three, six, nine, twelve, and fifteen. Regarding aggravating factor three, the court noted defendant's "alarming" criminal history, including four "disturbing[]" FROs and "two violations of those [FROs]." It determined defendant's history showed his "propensity to disregard societal laws and commit acts of violence." The court also found aggravating factors: six because defendant had an extensive criminal record; nine because "there[ wa]s a very great need to deter . . . defendant as well as the general population from engaging in this type of behavior"; twelve because it was "unequivocal" defendant knew D.P. "was in her [sixties]"; and fifteen because "the case involved an act of domestic violence," and "defendant

9

committed at least one act of domestic violence on more than one occasion," as evidenced by his four "FROs with two violations." The court found no mitigating factors and in balancing the factors, determined the aggravating factors "substantially outweigh[ed] the non-existent mitigating factors."

On appeal, defendant argues the following points:

POINT I

THE PROSECUTOR COMMITTED REVERSIBLE MISCONDUCT IN SUMMATION BY DENIGRATING THE CREDIBILITY OF THE DEFENSE'S KEY EXPERT WITNESS IN THE EYES OF THE JURY WITHOUT ANY SUPPORT IN THE RECORD.

POINT II

R.[A.]M. IS ENTITLED TO RESENTENCING BECAUSE THE TRIAL COURT ERRONEOUSLY DOUBLE-COUNTED AN ELEMENT OF THE OFFENSE AND CONSIDERED DISMISSED CHARGES IN FINDING AND WEIGHING AGGRAVATING FACTORS.

II.

A. Prosecutor's Summation

Defendant contends reversal is warranted because the prosecutor improperly commented on Dr. Gosselin's credibility during summation. Defendant specifically argues the prosecutor's statements regarding Dr.

Gosselin's compensation constituted "prosecutorial misconduct" and amounted to "plain error." After reviewing the record, we disagree.

Generally, a party's "failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry." State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404 (2019)). Plain errors are those "clearly capable of producing an unjust result." R. 2:10-2. Demonstrating plain error "is a 'high bar,' . . . requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Alessi, 240 N.J. 501, 527 (2020) (first quoting Santamaria, 236 N.J. at 404; and then quoting State v. Macon, 57 N.J. 325, 336 (1971)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" State v. Burnham, 474 N.J. Super. 226, 230 (App. Div. 2022) (quoting Santamaria, 236 N.J. at 404).

We first review the prosecutor's comments in the context of the entire

A-1444-23

summation for plain error because defense counsel did not object to the prosecutor's summation remarks. See State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (stating that a reviewing court must evaluate a prosecutor's challenged remarks in the context of the entire summation). Before the prosecutor's summation, defense counsel attempted to discredit Geran's opinion, stating that Geran: "had only conducted four or five forensic exam[ination]s involving smothering" similar to D.P.'s allegations; admitted "that there was no way of knowing for certain the causation of the physical observations of" D.P.; and "did not witness any kind of assault on" D.P. Thereafter, the prosecutor cast doubt on Dr. Gosselin's credibility during summation, asking, "Why would he disagree with [Geran's findings]? Because he[ wa]s paid to, right?" The prosecutor also raised whether Dr. Gosselin was biased because "[h]e was hired to author a report for the benefit of . . . defendant."

It is well-recognized that "[p]rosecutors may not make inaccurate factual or legal assertions during summation, and they must confine their remarks to evidence revealed during trial, and reasonable inferences to be drawn from the evidence." State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003). "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."

Clark, 251 N.J. at 289-90 (quoting State v. Frost, 158 N.J. 76, 82 (1999)). To determine whether a prosecutor's improper comments in summation warrant reversal, we assess whether the impropriety was "so egregious that it deprived the defendant of a fair trial." State v. Williams, 471 N.J. Super. 34, 45 (App. Div. 2022) (quoting State v. Smith, 167 N.J. 158, 181 (2001)).

"In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Supreme Life, 473 N.J. Super. 165, 172 (App. Div. 2022) (quoting State v. Williams, 244 N.J. 592, 608 (2021)). "Thus, '[t]o justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense.'" State v. Wakefield, 190 N.J. 397, 438 (2007) (alteration in original) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). "Every prosecutorial misstep [in summation] will not warrant a new trial." State v. Garcia, 245 N.J. 412, 436 (2021).

We recognize that in certain circumstances, defense counsel are

permitted to address an expert's compensation for their work.[2]  In the present case, it is undisputed that only defense counsel elicited the limited evidence regarding Dr. Gosselin's compensation.  Relevantly, there was no testimony or evidence in the record demonstrating that Dr. Gosselin's fees were unreasonable or extraordinary.  We also note that the State correctly acknowledges that the prosecutor's comments regarding Dr. Gosselin's compensation "were not necessarily proper."

Because the prosecutor's remarks challenging Dr. Gosselin's credibility and asserting bias were unfair statements based on the evidence, the comments were improper.  That determination, however, does not end our inquiry, as we must discern whether the "prosecutor's comments had the capacity to deprive defendant of a fair trial."  State v. McNeil-Thomas, 238 N.J. 256, 276 (2019).

---

[2]  We note the court is permitted to charge the jury regarding the consideration of an expert's compensation when appropriate.  The charge was not requested or provided in this case.  The applicable Model Jury Charge states in pertinent part that a juror "may consider the compensation received by the expert witness[] as bearing on (his/her/their) credibility.  You should understand, however, that there is nothing improper in any expert receiving reasonable compensation for (his/her) work or for (his/her) appearing in court," and "[i]f you find from the evidence that the amount of compensation received is unreasonable, or if you find from the evidence that the expert was paid simply to reach a particular result, you may consider whether that affects the credibility, interest[,] or bias of the witness."  Model Jury Charges (Criminal), "Optional Charge Concerning Compensation of Experts" (approved Oct. 1, 2001).

We observe that at the outset of the trial, the court instructed the jury to determine the facts "based solely upon the evidence submitted during the course of the trial" and that the "evidence" consisted of "the testimony of witnesses who would testify and any exhibits which may be marked into evidence." The court further explained that counsel would make opening statements and "in summation," present "their final arguments based upon their respective recollections of the evidence." It clarified that summations were "not evidence." It reinstructed the jury immediately after summations that the "statements, remarks, openings[,] and summations of counsel are not evidence and must not be treated as evidence." The court also stated, "Any comments by counsel are not control[ling]" and that the jury was "to arrive at a just conclusion after considering all the evidence."

We next briefly examine the relevant testimony and evidence introduced at trial because the prosecutor's challenged remarks are to be viewed "within the context of the trial as a whole." McNeil-Thomas, 238 N.J. at 276 (quoting State v. Feaster, 156 N.J. 1, 64 (1998)). D.P. testified that defendant attempted to smother her two or three times, and she tried to escape. In support of her testimony, D.P. provided receipts for her "priority" car ride home from the urgent care facility and locks purchased at the hardware store. D.P. explained that defendant's assaults left her with cuts and bruises. Geran corroborated

15

D.P.'s injuries through her forensic examination findings. Geran's photographs of D.P. memorialized the observed injuries, which the State published to the jury.[3] Further, Dr. Gosselin conceded that "a hand over the mouth for a matter of seconds"—consistent with D.P.'s testimony of what occurred on August 15, 2021—could "cause bleeding, bruising, and swelling to the alleged victim."

A review of the complete trial record, including the summation arguments, demonstrates the comments did not "substantially prejudice . . . defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Williams, 244 N.J. at 608-09 (quoting State v. Roach, 146 N.J. 208, 219 (1996)). The prosecutor's remarks regarding Dr. Gosselin's compensation were not a dominant focus of the summation. The record establishes that the prosecutor's inappropriate statements were limited and did not rise to the level of plain error.

We recognize that our Supreme Court in Smith reversed the defendant's conviction because it was prosecutorial misconduct to state during summation that the defense experts: received "hefty fees"; potentially "shade[d] their testimony"; and "hope[d] to get hired . . . in the future." 167 N.J. at 184-85. In concluding the prosecutor's remarks warranted a new trial, the Court evaluated the evidence and determined that "because [the] defendant's guilt

---

[3] We note the pictures were not included in the record on appeal.

depended entirely on which experts the jury believed, . . . the inappropriate comments made by the prosecutor could have improperly swayed the jury and denied defendant a fair trial." Id. at 187. In the present case, defendant's reliance on Smith is misplaced because the jury's decision on his guilt was not based "entirely" on which expert the jury believed. Here, although the prosecutor's limited statements were inappropriate, they were not similarly egregious, and ample other evidence supported the jury's conviction of defendant.

For these reasons, we conclude the prosecutor's statements were not "clearly capable of producing an unjust result," and defendant was not deprived of a fair trial or a jury fairly evaluating the merits of his defense. R. 2:10-2.

## B. Sentencing

We next address defendant's contentions that the court committed sentencing errors. Defendant specifically argues the court double-counted an element of his domestic violence related second-degree aggravated assault conviction, because in applying aggravating factor fifteen, N.J.S.A. 2C:44-1(a)(15), it relied on his present conviction for assaulting a victim of domestic violence and found he previously "committed at least one act of domestic violence on more than one occasion." He also asserts that the court improperly

considered "dismissed charges that did not result in convictions" and failed to "assign . . . weight to any of the aggravating factors." A review of the plain language of the aggravated assault and aggravating factor fifteen statutes, as well as the court's sentencing findings, demonstrates these contentions lack merit.

We use a limited scope of review when considering a court's sentencing determinations on appeal and apply an abuse of discretion standard. See State v. Torres, 246 N.J. 246, 272 (2021). We do "not second-guess the sentencing court" and defer to its factual findings. State v. Case, 220 N.J. 49, 65 (2014). The Supreme Court has elucidated that:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Further, sentencing appeals requiring statutory construction, such as the interpretation of the aggravating and mitigating factor statutes, involve "a question of law." See State v. Jones, 481 N.J. Super. 271, 280 (App. Div. 2025). "Statutory interpretations are . . . reviewed by an appellate court 'de

18                                                                          A-1444-23

novo, "unconstrained by deference to the decisions of the trial court."'" State v. Martinez-Mejia, 477 N.J. Super. 325, 334 (App Div. 2023) (quoting State v. Fuqua, 234 N.J. 583, 591 (2018)).

In addressing defendant's argument that the court wrongly found aggravating factor fifteen because it double-counted an element of the aggravated assault conviction under N.J.S.A. 2C:12-1(b)(13), namely, that the assault was against "a victim of domestic violence," we undertake a statutory analysis of both statutes. "In interpreting a statute, we 'give words "their ordinary meaning and significance,"' acknowledging that the 'statutory language is "the best indicator of [the Legislature's] intent."'" Fuqua, 234 N.J. at 591 (alteration in original) (quoting Tumpson v. Farina, 218 N.J. 450, 467 (2014)). "When construing the words of a statute, '[w]e are encouraged . . . to "read and examine the text of the act and draw inferences concerning the meaning from its composition and structure."'" State v. Gandhi, 201 N.J. 161, 179 (2010) (quoting State v. Smith, 197 N.J. 325, 333 (2009)). "Our de novo review requires that we 'give effect to the Legislature's intent as evidenced by the "language of [the] statute, the policy behind it, concepts of reasonableness and legislative history."'" State v. Rodriguez, 238 N.J. 105, 113 (2019) (alteration in original) (quoting State v. Carrigan, 428 N.J. Super. 609, 618 (App. Div. 2012)). "If a plain-language reading of the statute 'leads to a clear

19

and unambiguous result, then our interpretive process is over.'" State v. Italiano, 480 N.J. Super. 1, 9 (App. Div. 2024) (quoting State v. Hupka, 203 N.J. 222, 232 (2010)).

To convict defendant of aggravated assault under N.J.S.A. 2C:12-1(b)(13), the jury was required to find: defendant obstructed D.P.'s "breathing or blood circulation" by "applying pressure on . . . [D.P.'s] throat or neck or blocking . . . [D.P.'s] nose or mouth"; he acted knowingly or recklessly; D.P. met the definition of a "victim of domestic violence under N.J.S.A. 2C:25-19(d)"; and defendant "caused, or attempted to cause, bodily injury" to D.P.[4]

It was undisputed at trial that D.P. had a dating relationship with defendant. Therefore, D.P. qualified as a victim of domestic violence under N.J.S.A. 2C:12-1(b)(13). See N.J.S.A. 2C:25-19(d) (stating the definition of a "'[v]ictim of domestic violence' . . . includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship").

---

[4] We note that at the time of the trial, no model jury charge for N.J.S.A. 2C:12-1(b)(13) was approved. A model jury charge was published in November 2023. Model Jury Charges (Criminal), "Aggravated Assault – Strangulation of a Victim of Domestic Violence (N.J.S.A. 2C:12-1(b)(13))" (approved Nov. 13, 2023). We observe the court's jury instructions appropriately mirrors the later approved charge.

A-1444-23

Pursuant to aggravating factor fifteen's plain language, its application requires a court to find defendant's present conviction "involved an act of domestic violence," and "defendant committed at least one act of domestic violence on more than one occasion." N.J.S.A. 2C:44-1(a)(15). Stated another way, for a court to find aggravating factor fifteen, it must determine defendant committed an offense involving domestic violence and had previously committed a separate act of domestic violence. Therefore, aggravating factor fifteen only applies if the court finds based on sufficient credible evidence that a defendant had previously committed an act of domestic violence.

While we determine aggravating factor fifteen's plain language is clear, a review of the legislative history further evinces the Legislature's intent for courts to apply aggravating factor fifteen to defendants that have committed prior acts of domestic violence. We note that when the Senate Judiciary Committee considered proposed Criminal Code amendments related to "crimes associated with domestic violence," including amendments to N.J.S.A. 2C:44-1, it explicitly stated that sentencing courts shall consider "other crimes or offenses committed against victim of domestic violences." S. Judiciary Comm. Statement to S. 2559, at 2 (June 11, 2015). Specifically, regarding the enactment of aggravating factor fifteen, the Senate Judiciary Committee elucidated that when a defendant has committed "any act of domestic

21

violence," and "the abuser committed at least one act of domestic violence on more than one occasion," the aggravating factor is "established . . . for the court to consider when determining the possible length of the prison sentence imposed." Ibid. The Legislature clearly intended for courts to apply aggravating factor fifteen to defendants that have an established history of committing domestic violence and are convicted of committing a new offense against a victim of domestic violence.

Thus, in finding that factor fifteen applied, the court did not double-count the element that D.P. was a victim of domestic violence because it separately found defendant had committed prior acts of domestic violence, which were wholly unrelated to defendant's conviction. The court permissively considered, and found highly relevant, the multiple "active [FROs] . . . against [defendant] by former dating partners" and defendant's "two prior convictions for violations of the domestic violence restraining orders" for "simple assault and harassment" against two former dating partners. We note our Supreme Court has held that "[i]njuries to victims of other crimes of which defendant was convicted, . . . may be used as aggravating factors for sentencing of the defendant's particular offense." State v. Lawless, 214 N.J. 594, 608 (2013). Moreover, courts do "not engage in double-counting when [they] consider[] facts showing defendant did more than

A-1444-23

the minimum the State is required to prove to establish the elements of an offense." State v. A.T.C., 454 N.J. Super. 235, 254-55 (App. Div. 2018). In considering aggravating factor fifteen's applicability, the court made the threshold finding that defendant's present conviction involved an act committed against a victim of domestic violence and then appropriately considered and determined defendant had committed prior acts of domestic violence. For these reasons, we discern no error in the court's application of aggravating factor fifteen.

We turn to address defendant's assertions that the court improperly considered his dismissed offenses in finding aggravating factor three and failed to sufficiently explain the assigned weight to the aggravating factors found. Regarding aggravating factor three, defendant conflates the court's recitation of his criminal history with reliance on the dismissed offenses. The court noted defendant had a "substantial criminal history," and the "presentence investigation report" revealed defendant had "been arrested . . . on at least 27 occasions[,] including [for] the present offense." The court, in discussing defendant's history, differentiated between his dismissed offenses, borough ordinance violations, municipal court convictions, family court restraining orders, family court FRO contempt convictions, and indictable convictions. The court reasoned that: there was a risk of defendant reoffending; and

23

defendant had a substantial criminal history, emphasizing "the context" of the four FROs lodged against defendant and his "two [separate FRO] violations." Defendant's argument that the court relied on dismissed offenses is without merit, as the record demonstrates the court properly distinguished defendant's prior criminal record in its sentencing findings.

We are also unpersuaded by defendant's contention that a resentencing is warranted because the court failed to articulate the weight assigned to each aggravating factor. Relevantly, the court made detailed findings for each aggravating factor found but determined no mitigating factors applied.

At sentencing, the "court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008) (quoting State v. O'Donnell, 117 N.J. 210, 215 (1989)). The court must "state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting [the] sentence." R. 3:21-4(h); see also N.J.S.A. 2C:43-2(e). It is well-established that "[s]entences can . . . 'be upheld where the sentencing transcript makes it possible to "readily deduce" the judge's reasoning.'" State v.

24

Vanderee, 476 N.J. Super. 214, 239 (App. Div. 2023) (quoting State v. Miller, 205 N.J. 109, 129 (2011)).

The court sufficiently provided its reasons for finding each of the five aggravating factors and no mitigating factors. The court had no mitigating factors to balance and weigh against the aggravating factors found. In imposing defendant's sentence, the court stated that it was "clearly convinced that the aggravating factors outweigh[ed] the mitigating factors." Therefore, there is no reason to disturb defendant's sentence.

To the extent not addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1444-23